# DUNAWAY $v$. NEW YORK

No. 78–5066.   Argued March 21, 1979—Decided June 5, 1979

*Edward J. Nowak* argued the cause for petitioner. With him on the brief was *James M. Byrnes.*

*Melvin Bressler* argued the cause for respondent. With him on the brief was *Lawrence T. Kurlander.**

MR. JUSTICE BRENNAN delivered the opinion of the Court.

We decide in this case the question reserved 10 years ago in *Morales* v. *New York,* 396 U. S. 102 (1969), namely, "the question of the legality of custodial questioning on less than probable cause for a full-fledged arrest." *Id.,* at 106.

I

On March 26, 1971, the proprietor of a pizza parlor in Rochester, N. Y., was killed during an attempted robbery. On August 10, 1971, Detective Anthony Fantigrossi of the

---

*Richard Emery* and *Joel M. Gora* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

Rochester Police was told by another officer that an informant had supplied a possible lead implicating petitioner in the crime. Fantigrossi questioned the supposed source of the lead—a jail inmate awaiting trial for burglary—but learned nothing that supplied "enough information to get a warrant" for petitioner's arrest. App. 60.[1] Nevertheless, Fantigrossi ordered other detectives to "pick up" petitioner and "bring him in." *Id.*, at 54. Three detectives located petitioner at a neighbor's house on the morning of August 11. Petitioner was taken into custody; although he was not told he was under arrest, he would have been physically restrained if he had attempted to leave. Opinion in *People* v. *Dunaway* (Monroe County Ct., Mar. 11, 1977), App. 116, 117. He was driven to police headquarters in a police car and placed in an interrogation room, where he was questioned by officers after being given the warnings required by *Miranda* v. *Arizona,* 384 U. S. 436 (1966). Petitioner waived counsel and eventually made statements and drew sketches that incriminated him in the crime.[2]

At petitioner's jury trial for attempted robbery and felony murder, his motions to suppress the statements and sketches were denied, and he was convicted. On appeal, both the

---

[1] See opinion in *People* v. *Dunaway* (Monroe County Ct., Mar. 11, 1977), App. 116–117. An informant had reportedly told the other detective that one James Cole had said that he and someone named "Irving" had been involved in the crime. The informant did not know "Irving's" last name, but had identified a picture of petitioner Dunaway from a police file. After hearing this information, Fantigrossi interviewed Cole, who was in jail pending an indictment for burglary. Cole denied any involvement in the crime, but stated that he had been told about it two months earlier by another inmate, Hubert Adams. According to Cole, Adams had mentioned that his younger brother, Ba Ba Adams, had told him that he and a fellow named "Irving," also known as "Axelrod," had been involved in the crime.

[2] See 61 App. Div. 2d 299, 301, 402 N. Y. S. 2d 490, 491 (1978). The first statement was made within an hour after Dunaway reached the police station; the following day he made a second, more complete statement.

Appellate Division of the Fourth Department and the New York Court of Appeals initially affirmed the conviction without opinion. 42 App. Div. 2d 689, 346 N. Y. S. 2d 779 (1973), aff'd, 35 N. Y. 2d 741, 320 N. E. 2d 646 (1974). However, this Court granted certiorari, vacated the judgment, and remanded the case for further consideration in light of the Court's supervening decision in *Brown* v. *Illinois,* 422 U. S. 590 (1975). 422 U. S. 1053 (1975). The petitioner in *Brown,* like petitioner Dunaway, made inculpatory statements after receiving *Miranda* warnings during custodial interrogation following his seizure—in that case a formal arrest—on less than probable cause. Brown's motion to suppress the statements was also denied and the statements were used to convict him. Although the Illinois Supreme Court recognized that Brown's arrest was unlawful, it affirmed the admission of the statements on the ground that the giving of *Miranda* warnings served to break the causal connection between the illegal arrest and the giving of the statements. This Court reversed, holding that the Illinois courts erred in adopting a *per se* rule that *Miranda* warnings in and of themselves sufficed to cure the Fourth Amendment violation; rather the Court held that in order to use such statements, the prosecution must show not only that the statements meet the Fifth Amendment voluntariness standard, but also that the causal connection between the statements and the illegal arrest is broken sufficiently to purge the primary taint of the illegal arrest in light of the distinct policies and interests of the Fourth Amendment.

In compliance with the remand, the New York Court of Appeals directed the Monroe County Court to make further factual findings as to whether there was a detention of petitioner, whether the police had probable cause, "and, in the event there was a detention and probable cause is not found for such detention, to determine the further question as to whether the making of the confessions was rendered infirm

by the illegal arrest (see *Brown* v. *Illinois,* 422 U. S. 590, *supra*)." *People* v. *Dunaway,* 38 N. Y. 2d 812, 813–814, 345 N. E. 2d 583, 584 (1975).

The County Court determined after a supplementary suppression hearing that Dunaway's motion to suppress should have been granted. Although reaffirming that there had been "full compliance with the mandate of *Miranda* v. *Arizona,*" the County Court found that "this case does not involve a situation where the defendant voluntarily appeared at police headquarters in response to a request of the police . . . ." App. 117. The State's attempt to justify petitioner's involuntary investigatory detention on the authority of *People* v. *Morales,* 22 N. Y. 2d 55, 238 N. E. 2d 307 (1968)—which upheld a similar detention on the basis of information amounting to less than probable cause for arrest—was rejected on the grounds that the precedential value of *Morales* was questionable,[3] and that the controlling authority was the "strong language" in *Brown* v. *Illinois* indicating "disdain for custodial questioning without probable cause to arrest."[4] The County Court further held that "the factual predicate in this case did not amount to probable cause sufficient to support the arrest of the defendant," that "the *Miranda* warnings by themselves did not purge the taint of the defend-

---

[3] We granted certiorari in *Morales* and noted that "[t]he ruling below, that the State may detain for custodial questioning on less than probable cause for a traditional arrest, is manifestly important, goes beyond our subsequent decisions in *Terry* v. *Ohio,* 392 U. S. 1 (1968), and *Sibron* v. *New York,* 392 U. S. 40 (1968), and is claimed by petitioner to be at odds with *Davis* v. *Mississippi,* 394 U. S. 721 (1969)." *Morales* v. *New York,* 396 U. S. 102, 104–105 (1969). Nevertheless, inadequacies in the record led us to remand for further development and to reserve the issue we decide today for a record that "squarely and necessarily presents the issue and fully illuminates the factual context in which the question arises." *Id.,* at 105. On remand, the New York courts determined that Morales had gone to the police voluntarily. *People* v. *Morales,* 42 N. Y. 2d 129, 137–138, 366 N. E. 2d 248, 252–253 (1977).

[4] App. 118; see *Brown* v. *Illinois,* 422 U. S., at 602, 605.

ant's illegal seizure[,] *Brown* v. *Illinois, supra,* and [that] there was no claim or showing by the People of any attenuation of the defendant's illegal detention," App. 121. Accordingly petitioner's motion to suppress was granted. *Ibid.*

A divided Appellate Division reversed. Although agreeing that the police lacked probable cause to arrest petitioner, the majority relied on the Court of Appeals' reaffirmation, subsequent to the County Court's decision, that "[l]aw enforcement officials may detain an individual upon reasonable suspicion for questioning for a reasonable and brief period of time under carefully controlled conditions which are ample to protect the individual's Fifth and Sixth Amendment rights." 61 App. Div. 2d 299, 302, 402 N. Y. S. 2d 490, 492 (1978), quoting *People* v. *Morales,* 42 N. Y. 2d 129, 135, 366 N. E. 2d 248, 251 (1977). The Appellate Division also held that even if petitioner's detention were illegal, the taint of his illegal detention was sufficiently attenuated to allow the admission of his statements and sketches. The Appellate Division emphasized that petitioner was never threatened or abused by the police and purported to distinguish *Brown* v. *Illinois.*[5] The Court of Appeals dismissed petitioner's application for leave to appeal. App. 134.

We granted certiorari, 439 U. S. 979 (1978), to clarify the Fourth Amendment's requirements as to the permissible grounds for custodial interrogation and to review the New York court's application of *Brown* v. *Illinois.* We reverse.

## II

We first consider whether the Rochester police violated the Fourth and Fourteenth Amendments when, without probable cause to arrest, they took petitioner into custody, transported

[5] 61 App. Div. 2d, at 303–304, 402 N. Y. S. 2d, at 493. Two of the five members of the court dissented on this issue. *Id.,* at 304, 402 N. Y. S. 2d, at 493 (Denman, J., concurring); *id.,* at 305, 402 N. Y. S. 2d, at 494 (Cardamone, J., dissenting).

him to the police station, and detained him there for interrogation.

The Fourth Amendment, applicable to the States through the Fourteenth Amendment, *Mapp* v. *Ohio,* 367 U. S. 643 (1961), provides: "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue but upon probable cause . . . ." There can be little doubt that petitioner was "seized" in the Fourth Amendment sense when he was taken involuntarily to the police station.[6] And respondent State concedes that the police lacked probable cause to arrest petitioner before his incriminating statement during interrogation.[7] Nevertheless respondent contends that the seizure of petitioner did not amount to an arrest and was therefore permissible under the Fourth Amendment because the police had a "reasonable suspicion" that petitioner possessed "intimate knowledge about a serious and unsolved crime." Brief for Respondent 10. We disagree.

Before *Terry* v. *Ohio,* 392 U. S. 1 (1968), the Fourth

---

[6] "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry* v. *Ohio,* 392 U. S. 1, 16 (1968). Respondent contends that petitioner accompanied the police voluntarily and therefore was not "seized." Brief for Respondent 7–9. The County Court found otherwise, App. 117, quoted *supra,* at 205; and the Appellate Division treated the case as an involuntary detention justified by reasonable suspicion. See 61 App. Div. 2d, at 302–303, 402 N. Y. S. 2d, at 492. See also ALI, Model Code of Pre-Arraignment Procedure § 2.01 (3) and commentary, p. 91 (Tent. Draft No. 1, 1966) (request to come to police station "may easily carry an implication of obligation, while the appearance itself, unless clearly stated to be voluntary, may be an awesome experience for the ordinary citizen").

[7] Both the County Court and the Appellate Division found that the police lacked probable cause, and respondent does not question those findings here. See 61 App. Div. 2d, at 302, 402 N. Y. S. 2d, at 492; App. 120, citing *Spinelli* v. *United States,* 393 U. S. 410 (1969); *Aguilar* v. *Texas,* 378 U. S. 108 (1964).

Amendment's guarantee against unreasonable seizures of persons was analyzed in terms of arrest, probable cause for arrest, and warrants based on such probable cause. The basic principles were relatively simple and straightforward: The term "arrest" was synonymous with those seizures governed by the Fourth Amendment. While warrants were not required in all circumstances,[8] the requirement of probable cause, as elaborated in numerous precedents,[9] was treated as absolute.[10] The "long-prevailing standards" of probable cause embodied "the best compromise that has been found for accommodating [the] often opposing interests" in "safeguard[ing] citizens from rash and unreasonable interferences with privacy" and in "seek[ing] to give fair leeway for enforcing the law in the community's protection." *Brinegar* v. *United States,* 338 U. S. 160, 176 (1949). The standard of probable cause thus represented the accumulated wisdom of precedent and experience as to the minimum justification necessary to make the kind of intrusion involved in an arrest "reasonable" under the Fourth Amendment. The standard applied to all arrests, without the need to "balance" the interests and circumstances involved in particular situations. Cf. *Camara* v. *Municipal Court,* 387 U. S. 523 (1967).

*Terry* for the first time recognized an exception to the requirement that Fourth Amendment seizures of persons must

---

[8] See, *e. g., Warden* v. *Hayden,* 387 U. S. 294 (1967) (hot pursuit); *United States* v. *Watson,* 423 U. S. 411 (1976) (felony arrests in public places).

[9] "Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed [by the person to be arrested]." *Brinegar* v. *United States,* 338 U. S. 160, 175–176 (1949), quoting *Carroll* v. *United States,* 267 U. S. 132, 162 (1925). See generally 2 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment 436–480 (1978).

[10] See *Gerstein* v. *Pugh,* 420 U. S. 103, 111–112 (1975); *Ker* v. *California,* 374 U. S. 23 (1963).

be based on probable cause. That case involved a brief, on-the-spot stop on the street and a frisk for weapons, a situation that did not fit comfortably within the traditional concept of an "arrest." Nevertheless, the Court held that even this type of "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat" constituted a "serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment," 392 U. S., at 20, 17, and therefore "must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Id.*, at 20. However, since the intrusion involved in a "stop and frisk" was so much less severe than that involved in traditional "arrests," the Court declined to stretch the concept of "arrest"—and the general rule requiring probable cause to make arrests "reasonable" under the Fourth Amendment—to cover such intrusions. Instead, the Court treated the stop-and-frisk intrusion as a *sui generis* "rubric of police conduct," *ibid.* And to determine the justification necessary to make this specially limited intrusion "reasonable" under the Fourth Amendment, the Court balanced the limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety. *Id.*, at 22–27. As a consequence, the Court established "a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Id.*, at 27.[11] Thus, *Terry* departed from traditional Fourth Amendment analysis in two respects.

---

[11] The Court stressed the limits of its holding: the police officer's belief that his safety or that of others is in danger must be objectively reasonable—based on reasonable inferences from known facts—so that it can be tested at the appropriate time by "the more detached, neutral scrutiny of a judge," 392 U. S., at 21, 27; and the extent of the intrusion must be carefully tailored to the rationale justifying it.

First, it defined a special category of Fourth Amendment "seizures" so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment "seizures" reasonable could be replaced by a balancing test. Second, the application of this balancing test led the Court to approve this narrowly defined less intrusive seizure on grounds less rigorous than probable cause, but only for the purpose of a pat-down for weapons.

Because *Terry* involved an exception to the general rule requiring probable cause, this Court has been careful to maintain its narrow scope. *Terry* itself involved a limited, on-the-street frisk for weapons.[12] Two subsequent cases which applied *Terry* also involved limited weapons frisks. See *Adams* v. *Williams,* 407 U. S. 143 (1972) (frisk for weapons on basis of reasonable suspicion); *Pennsylvania* v. *Mimms,* 434 U. S. 106 (1977) (order to get out of car is permissible *"de minimis"* intrusion after car is lawfully detained for traffic violations; frisk for weapons justified after "bulge" observed in jacket). *United States* v. *Brignoni-Ponce,* 422 U. S. 873 (1975), applied *Terry* in the special context of roving border patrols stopping automobiles to check for illegal immigrants. The investigative stops usually consumed

---

[12] *Terry* specifically declined to address "the constitutional propriety of an investigative 'seizure' upon less than probable cause for purposes of 'detention' and/or interrogation." *Id.,* at 19 n. 16. MR. JUSTICE WHITE, in a concurring opinion, made these observations on the matter of interrogation during an investigative stop:

"There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets. Absent special circumstances, the person approached may not be detained or frisked but may refuse to cooperate and go on his way. However, given the proper circumstances, such as those in this case, it seems to me the person may be briefly detained against his will while pertinent questions are directed to him. Of course, the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation." *Id.,* at 34.

less than a minute and involved "a brief question or two." 422 U. S., at 880. The Court stated that "[b]ecause of the limited nature of the intrusion, stops of this sort may be justified on facts that do not amount to the probable cause required for an arrest." *Ibid.*[13] See also *United States* v. *Martinez-Fuerte,* 428 U. S. 543 (1976) (fixed checkpoint to stop and check vehicles for aliens); *Delaware* v. *Prouse,* 440 U. S. 648 (1979) (random checks for drivers' licenses and proper vehicle registration not permitted on less than articulable reasonable suspicion).

Respondent State now urges the Court to apply a balancing test, rather than the general rule, to custodial interrogations, and to hold that "seizures" such as that in this case may be justified by mere "reasonable suspicion."[14]  *Terry* and its

---

[13] "[B]ecause of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." 422 U. S., at 881.

[14] The factors that respondent would consider relevant in its balancing test, and the scope of the rule the test would produce, are not completely clear. The Appellate Division quoted two apparently different tests from the Court of Appeals opinion in *People* v. *Morales,* 42 N. Y. 2d 129, 366 N. E. 2d 248 (1977):

" '[L]aw enforcement officials may detain an individual upon reasonable suspicion for questioning for a reasonable and brief period of time under carefully controlled conditions which are ample to protect the individual's Fifth and Sixth Amendment rights' (42 NY2d, at p. 135). ' "[A] policeman's right to request information while discharging his law enforcement duties will hinge on the manner and intensity of the interference, the gravity of the crime involved and the circumstances attending the encounter" ' (42 NY2d, at p. 137, quoting from *People* v. *De Bour,* 40 NY2d 210, 219)." 61 App. Div. 2d, at 302, 402 N. Y. S. 2d, at 492.

Then, in characterizing the case before it, the Appellate Division suggested yet a third "test":

"[T]his case involves a brief detention for interrogation based upon reasonable suspicion, where there was no formal accusation filed against defend-

progeny clearly do not support such a result. The narrow intrusions involved in those cases were judged by a balancing test rather than by the general principle that Fourth Amendment seizures must be supported by the "long-prevailing standards" of probable cause, *Brinegar* v. *United States,* 338 U. S., at 176, only because these intrusions fell far short of the kind of intrusion associated with an arrest. Indeed, *Brignoni-Ponce* expressly refused to extend *Terry* in the manner respondent now urges. The Court there stated: "The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, *but any further detention or search must be based on consent or probable cause."* 422 U. S., at 881–882 (emphasis added). Accord, *United States* v. *Martinez-Fuerte, supra,* at 567.

In contrast to the brief and narrowly circumscribed intrusions involved in those cases, the detention of petitioner was in important respects indistinguishable from a traditional arrest. Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was "free to go"; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody. The application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an "arrest" under state law. The mere facts that petitioner was not told he was under arrest, was not "booked," and would not have had an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes, see *Cupp* v. *Murphy,* 412 U. S. 291 (1973), obviously do not make petitioner's

---

ant and where great public interest existed in solving a brutal crime which had remained unsolved for a period of almost five months." *Id.,* at 303, 402 N. Y. S. 2d, at 492.

seizure even roughly analogous to the narrowly defined intrusions involved in *Terry* and its progeny. Indeed, any "exception" that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are "reasonable" only if based on probable cause.

The central importance of the probable-cause requirement to the protection of a citizen's privacy afforded by the Fourth Amendment's guarantees cannot be compromised in this fashion. "The requirement of probable cause has roots that are deep in our history." *Henry* v. *United States,* 361 U. S. 98, 100 (1959). Hostility to seizures based on mere suspicion was a prime motivation for the adoption of the Fourth Amendment, and decisions immediately after its adoption affirmed that "common rumor or report, suspicion, or even 'strong reason to suspect' was not adequate to support a warrant for arrest." *Id.,* at 101 (footnotes omitted). The familiar threshold standard of probable cause for Fourth Amendment seizures reflects the benefit of extensive experience accommodating the factors relevant to the "reasonableness" requirement of the Fourth Amendment, and provides the relative simplicity and clarity necessary to the implementation of a workable rule. See *Brinegar* v. *United States, supra,* at 175–176.

In effect, respondent urges us to adopt a multifactor balancing test of "reasonable police conduct under the circumstances" to cover all seizures that do not amount to technical arrests.[15] But the protections intended by the Framers could all too easily disappear in the consideration and balancing of the multifarious circumstances presented by different cases, especially when that balancing may be done in the first instance by police officers engaged in the "often competitive enterprise of ferreting out crime." *Johnson* v. *United States,* 333 U. S. 10, 14 (1948). A single, familiar standard is essential to

---

[15] See n. 14, *supra.*

guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront.[16] Indeed, our recognition of these dangers, and our consequent reluctance to depart from the proved protections afforded by the general rule, are reflected in the narrow limitations emphasized in the cases employing the balancing test. For all but those narrowly defined intrusions, the requisite "balancing" has been performed in centuries of precedent and is embodied in the principle that seizures are "reasonable" only if supported by probable cause.

Moreover, two important decisions since *Terry* confirm the conclusion that the treatment of petitioner, whether or not it is technically characterized as an arrest, must be supported by probable cause. *Davis* v. *Mississippi,* 394 U. S. 721 (1969), decided the Term after *Terry,* considered whether fingerprints taken from a suspect detained without probable cause must be excluded from evidence. The State argued that the detention "was of a type which does not require probable cause," 394 U. S., at 726, because it occurred during an investigative, rather than accusatory, stage, and because it was for the sole purpose of taking fingerprints. Rejecting the State's first argument, the Court warned:

> "[T]o argue that the Fourth Amendment does not apply to the investigatory stage is fundamentally to misconceive the purposes of the Fourth Amendment. Investigatory seizures would subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our

---

[16] While the rule proposed by respondent is not entirely clear, the Appellate Division cited with approval a test that would require an officer to weigh before any custodial interrogation "the manner and intensity of the interference, the gravity of the crime involved and the circumstances attending the encounter." See n. 14, *supra.*

citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.' "  *Id.,* at 726–727.

The State's second argument in *Davis* was more substantial, largely because of the *distinctions* between taking fingerprints and interrogation:

> "Fingerprinting involves none of the probing into an individual's private life and thoughts that marks an interrogation or search.  Nor can fingerprint detention be employed repeatedly to harass any individual, since the police need only one set of each person's prints.  Furthermore, fingerprinting is an inherently more reliable and effective crime-solving tool than eyewitness identifications or confessions and is not subject to such abuses as the improper line-up and the 'third degree.'  Finally, because there is no danger of destruction of fingerprints, the limited detention need not come unexpectedly or at an inconvenient time."  *Id.,* at 727.

In *Davis,* however, the Court found it unnecessary to decide the validity of a "narrowly circumscribed procedure for obtaining" the fingerprints of suspects without probable cause— in part because, as the Court emphasized, "petitioner was not merely fingerprinted during the . . . detention but *also subjected to interrogation.*"  *Id.,* at 728 (emphasis added).  The detention therefore violated the Fourth Amendment.

*Brown* v. *Illinois,* 422 U. S. 590 (1975), similarly disapproved arrests made for "investigatory" purposes on less than probable cause.  Although Brown's arrest had more of the trappings of a technical formal arrest than petitioner's, such differences in form must not be exalted over substance.[17]

---

[17] The officers drew their guns, informed Brown that he was under arrest, and handcuffed him.  But Brown, unlike petitioner, was not a teenager; and the police had a report that he possessed a pistol and had used it on occasion, 422 U. S., at 594.  The police in this case would have resorted to similar measures if petitioner had resisted being taken into custody.  App. 117.

Once in the police station, Brown was taken to an interrogation room, and his experience was indistinguishable from petitioner's. Our condemnation of the police conduct in *Brown* fits equally the police conduct in this case:

"The impropriety of the arrest was obvious; awareness of the fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was 'for investigation' or for 'questioning.' . . . The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up." *Id.,* at 605.

See also *id.,* at 602.

These passages from *Davis* and *Brown* reflect the conclusion that detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest. We accordingly hold that the Rochester police violated the Fourth and Fourteenth Amendments when, without probable cause, they seized petitioner and transported him to the police station for interrogation.

## III

There remains the question whether the connection between this unconstitutional police conduct and the incriminating statements and sketches obtained during petitioner's illegal detention was nevertheless sufficiently attenuated to permit the use at trial of the statements and sketches. See *Wong Sun* v. *United States,* 371 U. S. 471 (1963); *Nardone* v. *United States,* 308 U. S. 338 (1939); *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385 (1920).

The New York courts have consistently held, and petitioner does not contest, that proper *Miranda* warnings were given and that his statements were "voluntary" for purposes of the Fifth Amendment. But *Brown* v. *Illinois, supra,* settled that

"[t]he exclusionary rule, . . . when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth," 422 U. S., at 601, and held therefore that *"Miranda* warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation." *Ibid.*

> "If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. . . . Arrests made without warrant or without probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings." *Id.,* at 602.

Consequently, although a confession after proper *Miranda* warnings may be found "voluntary" for purposes of the Fifth Amendment,[18] this type of "voluntariness" is merely a "threshold requirement" for Fourth Amendment analysis, 422 U. S., at 604. Indeed, if the Fifth Amendment has been violated, the Fourth Amendment issue would not have to be reached.

Beyond this threshold requirement, *Brown* articulated a test designed to vindicate the "distinct policies and interests of the Fourth Amendment." *Id.,* at 602. Following *Wong Sun,* the Court eschewed any *per se* or "but for" rule, and identified the relevant inquiry as "whether Brown's statements were obtained by exploitation of the illegality of his arrest," 422 U. S., at 600; see *Wong Sun* v. *United States, supra,* at 488. *Brown*'s focus on "the causal connection between the illegality and the confession," 422 U. S., at 603, reflected the two policies behind the use of the exclusionary rule to effec-

---

[18] But see *Westover* v. *United States,* 384 U. S. 436, 494–497 (1966) (decided with *Miranda* v. *Arizona*).

tuate the Fourth Amendment. When there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but use of the evidence is more likely to compromise the integrity of the courts.

*Brown* identified several factors to be considered "in determining whether the confession is obtained by exploitation of an illegal arrest[: t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct . . . . And the burden of showing admissibility rests, of course, on the prosecution." *Id.,* at 603–604.[19] Examining the case before it, the Court readily concluded that the State had failed to sustain its burden of showing the confession was admissible. In the "less than two hours" that elapsed between the arrest and the confession "there was no intervening event of significance whatsoever." *Ibid.* Furthermore, the arrest without probable cause had a "quality of purposefulness" in that it was an "expedition for evidence" admittedly undertaken "in the hope that something might turn up." *Id.,* at 605.

The situation in this case is virtually a replica of the situation in *Brown.* Petitioner was also admittedly seized without probable cause in the hope that something might turn up, and confessed without any intervening event of significance.[20] Nevertheless, three members of the Appellate Division purported to distinguish *Brown* on the ground that the police did not threaten or abuse petitioner (presumably putting aside his illegal seizure and detention) and that the police

---

[19] See generally, 3 LaFave, *supra* n. 9, at 630–638; Comment, 25 Emory L. J. 227, 239–244 (1976); Comment, 13 Houston L. Rev. 753, 763–770 (1976).

[20] The cases are even parallel in that both Brown and petitioner made subsequent statements, see n. 2, *supra; Brown* v. *Illinois,* 422 U. S., at 595–596, which in each case were "clearly the result and the fruit of the first." *Id.,* at 605, and n. 12.

conduct was "highly protective of defendant's Fifth and Sixth Amendment rights." 61 App. Div. 2d, at 303, 402 N. Y. S. 2d, at 493. This betrays a lingering confusion between "voluntariness" for purposes of the Fifth Amendment and the "causal connection" test established in *Brown*. Satisfying the Fifth Amendment is only the "threshold" condition of the Fourth Amendment analysis required by *Brown*. No intervening events broke the connection between petitioner's illegal detention and his confession. To admit petitioner's confession in such a case would allow "law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the 'procedural safeguards' of the Fifth." [21]

*Reversed.*

MR. JUSTICE POWELL took no part in the consideration or decision of this case.

MR. JUSTICE WHITE, concurring.

The opinion of the Court might be read to indicate that *Terry* v. *Ohio*, 392 U. S. 1 (1968), is an almost unique exception to a hard-and-fast standard of probable cause. As our prior cases hold, however, the key principle of the Fourth Amendment is reasonableness—the balancing of competing interests. *E. g., Delaware* v. *Prouse*, 440 U. S. 648, 653–654 (1979); *Michigan* v. *Tyler*, 436 U. S. 499, 506 (1978); *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 321–322 (1978); *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 555 (1976); *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 878 (1975); *Terry* v. *Ohio, supra,* at 20–21; *Camara* v. *Municipal Court*, 387 U. S. 523, 536–537 (1967). But if courts and law enforcement officials are to have workable rules, see *Rakas* v. *Illinois*, 439 U. S. 128, 168 (1978) (dissenting opinion), this balancing must in large part be done on a categorical basis—not in an ad hoc, case-by-

---

[21] Comment, 25 Emory L. J. 227, 238 (1976).

case fashion by individual police officers. Cf. *Mincey* v. *Arizona,* 437 U. S. 385, 394–395 (1978). On the other hand, the need for rules of general applicability precludes neither the recognition in particular cases of extraordinary private or public interests, cf. *Zurcher* v. *Stanford Daily,* 436 U. S. 547, 564–565 (1978), nor the generic recognition of certain exceptions to the normal rule of probable cause where more flexibility is essential. Cf., *e. g., Terry* v. *Ohio, supra.* It is enough, for me, that the police conduct here is similar enough to an arrest that the normal level of probable cause is necessary before the interests of privacy and personal security must give way.

MR. JUSTICE STEVENS, concurring.

Although I join the Court's opinion, I add this comment on the significance of two factors that may be considered when determining whether a confession has been obtained by exploitation of an illegal arrest.

The temporal relationship between the arrest and the confession may be an ambiguous factor. If there are no relevant intervening circumstances, a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one. Conversely, even an immediate confession may have been motivated by a prearrest event such as a visit with a minister.

The flagrancy of the official misconduct is relevant, in my judgment, only insofar as it has a tendency to motivate the defendant. A midnight arrest with drawn guns will be equally frightening whether the police acted recklessly or in good faith. Conversely, a courteous command has the same effect on the arrestee whether the officer thinks he has probable cause or knows that he does not. In either event, if the Fourth Amendment is violated, the admissibility question will turn on the causal relationship between that violation and the defendant's subsequent confession.

I recognize that the deterrence rationale for the exclusion-

ary rule is sometimes interpreted quite differently.[1] Under that interpretation, exclusion is applied as a substitute for punishment of the offending officer; if he acted recklessly or flagrantly, punishment is appropriate, but if he acted in good faith, it is not.[2] But when evidence is excluded at a criminal trial, it is the broad societal interest in effective law enforcement that suffers. The justification for the exclusion of evidence obtained by improper methods is to motivate the law enforcement profession as a whole—not the aberrant individual officer—to adopt and enforce regular procedures that will avoid the future invasion of the citizen's constitutional rights. For that reason, exclusionary rules should embody objective criteria rather than subjective considerations.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

If the Court did no more in this case than it announced in the opening sentence of its opinion—"decide . . . the question reserved 10 years ago in *Morales* v. *New York*, 396 U. S. 102 (1969), namely, 'the question of the legality of custodial questioning on less than probable cause for a full-fledged arrest' "—I would have little difficulty joining its opinion. The decision of this question, however, does not, contrary to the implication in the Court's opening sentence, decide this case. For the Court goes on to conclude that petitioner Dunaway was in fact "seized" within the meaning of the Fourth Amendment, and that the connection between Dunaway's purported detention and the evidence obtained therefrom was not sufficiently attenuated as to dissipate the taint of the alleged unlawful police conduct. *Ante*, at 207, 216–219. I cannot agree with either conclusion, and accordingly, I dissent.

---

[1] See, *e. g.*, MR. JUSTICE REHNQUIST, dissenting, *post*, at 226.

[2] I would agree that the officer's subjective state of mind is relevant when he is being sued for damages, but this case involves the question whether the evidence he has obtained is admissible at trial.

I

There is obviously nothing in the Fourth Amendment that prohibits police from calling from their vehicle to a particular individual on the street and asking him to come over and talk with them; nor is there anything in the Fourth Amendment that prevents the police from knocking on the door of a person's house and when the person answers the door, inquiring whether he is willing to answer questions that they wish to put to him. "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry* v. *Ohio,* 392 U. S. 1, 19 n. 16 (1968). Voluntary questioning not involving any "seizure" for Fourth Amendment purposes may take place under any number of varying circumstances. And the occasions will not be few when a particular individual agrees voluntarily to answer questions that the police wish to put to him either on the street, at the station, or in his house, and later regrets his willingness to answer those questions. However, such morning-after regrets do not render involuntary responses that were voluntary at the time they were made. In my view, this is a case where the defendant voluntarily accompanied the police to the station to answer their questions.

In *Terry* v. *Ohio,* the Court set out the test for determining whether a person has been "seized" for Fourth Amendment purposes. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Ibid.* In this case three police officers were dispatched to petitioner's house to question him about his participation in a robbery According to the testimony of the police officers, one officer approached a house where petitioner was thought to be located and knocked on the door. When a person answered the door, the officer identified himself and asked the individual his name. App. 97–98. After learning that the person who answered the door was

petitioner, the officer asked him if he would accompany the officers to police headquarters for questioning, and petitioner responded that he would. *Id.*, at 89–90; see 61 App. Div. 2d 299, 301, 402 N. Y. S. 2d 490, 491 (1978). Petitioner was not told that he was under arrest or in custody and was not warned not to resist or flee. No weapons were displayed and petitioner was not handcuffed. Each officer testified that petitioner was not touched or held during the trip downtown; his freedom of action was not in any way restrained by the police. App. 78–79, 99. In short, the police behavior in this case was entirely free of "physical force or show of authority."

The Court, however, categorically states in text that "[t]here can be little doubt that petitioner was 'seized' in the Fourth Amendment sense when he was taken involuntarily to the police station." *Ante,* at 207. In an accompanying footnote, the Court states: "Respondent contends that petitioner accompanied the police voluntarily and therefore was not 'seized.' . . . The County Court found otherwise . . . and the Appellate Division treated the case as an involuntary detention justified by reasonable suspicion." *Ante,* at 207 n. 6. The Court goes on to cite a commentary from the Tentative Draft of the ALI Model Code of Pre-Arraignment Procedure to the effect that a "request to come to [the] police station 'may easily carry an implication of obligation, while the appearance itself, unless clearly stated to be voluntary, may be an awesome experience for the ordinary citizen.' " *Ibid.*

The Court's heavy reliance on the conclusions of the Monroe County Court on this issue is misplaced, however. That court clearly did not apply the *Terry* standard in determining whether there had been a seizure. Instead, that court's conclusions were based solely on the facts that petitioner was in the physical custody of detectives until he reached police headquarters and that "had he attempted to leave the company of the said detectives, they would have physically restrained him (per stipulation of People at conclusion of hearing)." App. 117. But the fact that the officers accompanied

petitioner from his house to the station in no way vitiates the State's claim that petitioner acted voluntarily. Similarly, the unexpressed intentions of police officers as to hypothetical situations have little bearing on the question whether the police conduct, objectively viewed, restrained petitioner's liberty by show of force or authority.

The Appellate Division's opinion also can be of no assistance to the Court. The Court's opinion characterizes the Appellate Division's treatment of the case "as an involuntary detention justified by reasonable suspicion." *Ante,* at 207 n. 6. But the Appellate Division did not accept the County Court's conclusion that petitioner did not voluntarily accompany the police to the station. To the contrary, in its recitation of the facts, the Appellate Division recites the officers' testimony that petitioner voluntarily agreed to come downtown to talk with them. 61 App. Div. 2d, at 301, 302, 402 N. Y. S. 2d, at 491, 492. That the Appellate Division found that it was able to resolve the case on the basis of the Court of Appeals' decision in *People* v. *Morales,* 42 N. Y. 2d 129, 366 N. E. 2d 248 (1977), does not mean that the Appellate Division decided that petitioner had been "seized" within the meaning of the Fourth Amendment.

Finally, the Court quotes the Model Code for Pre-Arraignment Procedure to support its assertion. *Ante,* at 207 n. 6. I do not dispute the fact that a police request to come to the station may indeed be an "awesome experience." But I do not think that that fact alone means that in every instance where a person assents to a police request to come to headquarters, there has been a "seizure" within the meaning of the Fourth Amendment. The question turns on whether the officer's conduct is objectively coercive or physically threatening, not on the mere fact that a person might in some measure feel cowed by the fact that a request is made by a police officer. Cf. *Oregon* v. *Mathiason,* 429 U. S. 492, 495 (1977).[1]

---

[1] Neither *Davis* v. *Mississippi,* 394 U. S. 721 (1969), nor *Brown* v. *Illinois,* 422 U. S. 590 (1975), which the Court treats as points of depar-

Therefore, although I agree that the police officers in this case did not have that degree of suspicion or probable cause that would have justified them in physically compelling petitioner to accompany them to the police station for questioning, I do not believe that the record demonstrates as a fact that this is what happened. No involuntary detention for questioning was shown to have taken place. The Fourth Amendment, accordingly, does not require suppression of petitioner's statements.

## II

Assuming, *arguendo*, that there was a "seizure" in this case, I still cannot agree with the Court that the Fourth Amendment requires suppression of petitioner's statements and sketches. Relying on *Brown* v. *Illinois*, 422 U. S. 590 (1975), the Court concludes that this evidence must be suppressed primarily, it seems, because no intervening events broke the connection between petitioner's detention and his confession. *Ante,* at 219. In my view, the connection between petitioner's allegedly unlawful detention and the incriminating statements and sketches is sufficiently attenuated to permit their use at trial. See *Wong Sun* v. *United States,* 371 U. S. 471 (1963).

---

ture for today's opinion, supports the Court's conclusion that petitioner was "seized" within the meaning of the Fourth Amendment. In *Davis,* the State made no claim that Davis had voluntarily accompanied the police officers to headquarters. 394 U. S., at 726. Similarly, in *Brown* there could be no reasonable disagreement that the defendant had been "seized" for Fourth Amendment purposes. In *Brown,* two detectives of the Chicago police force broke into Brown's apartment and searched it. When Brown entered the apartment, he was told that he was under arrest, was held at gunpoint, and was searched. He then was handcuffed and escorted to the squad car that eventually took him to the police station. 422 U. S., at 593. No doubt this police activity was the cause of the Court's observation that "[t]he illegality here, moreover, had a quality of purposefulness. . . . The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion." *Id.,* at 605. No such circumstances occurred here.

In *Brown* v. *Illinois, supra,* we identified several factors to be considered in determining whether inculpatory statements were sufficiently a product of free will to be admissible under the Fourth Amendment. The voluntariness of the statements is a threshold requirement. That *Miranda* warnings are given is "an important factor." 422 U. S., at 603–604. Also relevant are "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct." *Ibid.* But the Court did not assign equal weight to each of these factors. Given the deterrent purposes of the exclusionary rule, the "purpose and flagrancy" of the police conduct is, in my view, the most important factor. Where police have acted in good faith and not in a flagrant manner, I would require no more than that proper *Miranda* warnings be given and that the statement be voluntary within the meaning of the Fifth Amendment. *Brown* v. *Illinois, supra,* at 612 (POWELL, J., concurring in part). "Absent aggravating circumstances, I would consider a statement given at the station house after one has been advised of *Miranda* rights to be sufficiently removed from the immediate circumstances of the illegal arrest to justify its admission at trial." *Ibid.*

The Court concedes that petitioner received proper *Miranda* warnings and that his statements were "voluntary" for purposes of the Fifth Amendment. *Ante,* at 216. And the police acted in good faith. App. 61; see *United States* v. *Peltier,* 422 U. S. 531, 536–537 (1975). At the time of petitioner's detention, the New York Court of Appeals had held that custodial questioning on less than probable cause for an arrest was permissible under the Fourth Amendment. *People* v. *Morales,* 22 N. Y. 2d 55, 238 N. E. 2d 307 (1968).[2] Petitioner

---

[2] This Court granted certiorari in *Morales,* but, as the Court points out, *ante,* at 205 n. 3, we ultimately reserved decision on the question of the legality of involuntary investigatory detention on less than probable cause. *Morales* v. *New York,* 396 U. S. 102 (1969).

testified that the police never threatened or abused him. App. 35. Petitioner voluntarily gave his first statement to police about an hour after he reached the police station and then gave another statement to police the following day. Contrary to the Court's suggestion, the police conduct in this case was in no manner as flagrant as that of the police in *Brown* v. *Illinois, supra.* See 422 U. S., at 605; n. 1, *supra.* Thus, in my view, the record convincingly demonstrates that the statements and sketches given police by petitioner were of sufficient free will as to purge the primary taint of his alleged illegal detention. I would, therefore, affirm the judgment of the Appellate Division of the Supreme Court of New York.