OPINION OF THE COURT
Nicholas Figueroa, J.
This case deals with a novel issue concerning the scope of a Miranda rights waiver, which defendant, a prison inmate, claims was limited to the narrow purpose of enabling him to discuss a fictional crime he concocted to obscure his involvement in the felony murder of a former police officer. Defendant also argued that his earlier un-Mirandized prison interview, during which he was ostensibly interviewed as a friendly witness, was improper, and tainted a subsequent post -Miranda interview. A secondary issue concerned the sufficiency of defendant’s moving papers for holding a Dunaway hearing.
The indictment charges defendant and two codefendants with murder in the second degree pursuant to Penal Law § 125.25 (3), arising from a robbery of a Radio Shack store on November 19, 1992, in the course of which one of the participants caused the death of another person.
Defendant moves to suppress his recorded and verbal statements on the grounds that they were obtained in violation of his rights under Miranda v Arizona (384 US 436 [1966]). Defendant also moves for a hearing pursuant to Dunaway v New York (442 US 200 [1979]), which was denied for reasons set forth within.
On March 1 and 2,1999, a Huntley hearing (People v Huntley, 15 NY2d 72 [1965]) was held before this court. The People presented the testimony of Detective Anton Petrak, Detective John Ferrari and Detective James Turnbull, all of the Manhattan South Homicide Squad. The court found the prosecution witnesses credible.
*731 PROLOGUE
In the course of an armed robbery of a Radio Shack store in lower Manhattan on November 19, 1992 a retired police sergeant was killed during an exchange of gunfire with the three robbers. Through a long and persistent investigation, the detectives obtained statements inculpating defendant as one of the robbers from codefendant Gibson, who had been shot during defendants’ flight from the store. Gibson had hurried to a Brooklyn hospital, where he falsely reported to emergency room doctors that his gunshot wound resulted from a drive-by shooting.
As the last remaining robbery suspect, the defendant represented the capstone to the detectives’ protracted investigation. Since a frontal confrontation with defendant was fraught with the potential for resistance, an indirect approach was sought. Consequently, it was decided that defendant would initially be questioned concerning the codefendant’s bogus drive-by shooting which defendant had allegedly observed.
FACTS
On October 31, 1997, at about 11:20 a.m., Detective Petrak, recently apprised of defendant’s role in the 1992 robbery, met defendant in the recreation room of the Washington Correctional Institute in upstate New York. After introducing himself, Detective Petrak, in the presence of Detective Hayes, informed defendant, an inmate serving a sentence for an unrelated robbery, that he was investigating “old shootings”, including the drive-by shooting of codefendant Gibson, which defendant had claimed witnessing. After engaging in small talk with defendant, Detective Petrak obtained a written statement and diagram of defendant’s purported observations of the drive-by shooting on the day of the Radio Shack homicide. Upon concluding the interview at 12:05 p.m., Detective Petrak informed defendant that he might revisit him.
True to his word, on November 7th Detective Petrak returned, this time to the prison’s library, where he met defendant at 11:40 a.m. and explained that because of discrepancies in defendant’s version of the drive-by shooting he thought it best to advise defendant of his Miranda rights. In the presence of his partner Detective Hayes, Detective Petrak proceeded to read defendant his Miranda rights at 11:40 a.m. from a printed form which was signed by defendant. Detective Petrak then asked defendant to view 10 photos, including those of codefendants Gibson and Davis. Defendant recognized codefendant *732 Davis’s photo, disclosing that he had a reputation for armed robberies. Defendant also picked out a photo of codefendant Gibson, the alleged victim of the drive-by shooting.
Detective Petrak then suggested defendant finish his lunch, and left the library. Upon his return he confronted defendant with individual photos of the two codefendants and the front entrance of the Radio Shack store, while asking defendant whether he knew who had shot the retired police sergeant. After initially denying any knowledge of the robbery, defendant became visibly upset and gave a handwritten statement, which he completed at 12:45 p.m., at which time Detective Petrak left the library.
Feeling the need for an audio version of defendant’s admissions, it was decided that Detective Turnbull would visit the prison library at 1:25 p.m. and question defendant while wearing a hidden recording device. After introducing himself to defendant, Detective Turnbull reminded defendant of his Miranda rights by displaying the signed printed waiver form. He then proceeded to covertly record their 20-minute interview. During this interview defendant spoke of the detailed participation by himself and the two codefendants in the Radio Shack robbery.
Detective Petrak reentered the library at 1:45 p.m., with Detective Hayes, and informed defendant that defendant had given them distortions and that he wanted the truth. Shortly thereafter, defendant admitted firing at the deceased and memorialized his confession in another written statement which he completed and signed at 2:50 p.m.
Detective Petrak again left defendant in the library and returned at 4:07 p.m. with Detective Ferrari, who had previously obtained a written statement from defendant at 3:30 p.m. during one of Detective Petrak’s absences. On this occasion, in an apparent attempt to wrap up any possible loose ends, Detective Petrak also wore a concealed recording device during Detective Ferrari’s questioning. A 26-minute recording of defendant’s statement resulted.
CONCLUSIONS OF LAW
A. Right to a Dunaway Hearing
On the issue of defendant’s right to a Dunaway hearing, this court finds defendant’s moving papers are factually insufficient. People v Mendoza (82 NY2d 415 [1993]) makes it clear that defendant must, to be entitled to a Dunaway hearing, *733 provide some factual information as to his activities at the relevant time. The purpose of this requirement is to assist the court in determining whether probable cause for an arrest existed. In People v Covington (144 AD2d 238 [1st Dept 1988]), the Court held that in order to be entitled to a suppression hearing on the issue of probable cause a defendant must first fulfill his statutory burden of alleging sufficient facts to establish that the subject matter of the suppression was seized under unlawful circumstances. Accordingly, in People v Rosario (245 AD2d 151 [1st Dept 1997]), the Court found that defendant’s not guilty plea was not by itself a denial of criminal activity sufficient to raise a factual issue warranting a Dun-away hearing. Also see People v Powell (257 AD2d 514 [1st Dept 1999]), where, as in the instant case, defendant merely submitted his counsel’s affirmation to the effect that while an inmate in correctional institution defendant was questioned, and gave a statement to the police. The Court held that in the absence of facts demonstrating that probable cause did not exist, defendant was not entitled to a Dunaway hearing. This court reaches the same conclusion in regard to defendant’s situation.
B. The Huntley Hearing: The October 31, 1997 Visit
A more complex issue is whether Miranda warnings were required when defendant was first questioned by the police during their October 31, 1997 visit. First to be determined is whether the detective’s first visit on October 31st involved a custodial interrogation of defendant requiring Miranda warnings. The prosecution argues that on October 31st, defendant was ostensibly questioned as a witness about a fictional drive-by shooting, and as such, defendant could not have viewed the interrogation as custodial. However, the Court of Appeals in People v Alls (83 NY2d 94 [1993], cert denied 511 US 1090 [1994]), makes no distinction as to whether a defendant is ostensibly being interviewed as a witness or a suspect. Alls stands for the proposition that while the questioning of an imprisoned inmate is not per se custodial, it is presumed that custody by law enforcement officers is inherently coercive for Miranda purposes, even in a nonthreatening ambiance. Miranda warnings would therefore be required where an added constraint would lead a prison inmate to believe that an additional restriction has been invoked on his freedom over and above that of his usual confinement. If, as here, the correction officers were directing defendant’s movement to a separate *734 area such as the recreational room on October 31st, or the prison library on November 7th, defendant would be deemed under compulsion to comply. To counteract this conclusion, the People would need to submit some mitigating factor. For instance, that defendant made his way to the meeting site unescorted, or that defendant was given a choice as to the basis or place of the interview. Such mitigating factors might be persuasive in finding that defendant reasonably believed there was no compulsion to follow the correction officer’s directions. Conversely, in Alls (supra), prison regulations requiring compliance with a correction officer’s directions regarding movement within the facility was significant in finding that defendant believed he was under compulsion to accompany the correction officer to the interview site. In the instant case, on the basis of the evidence adduced at the hearing, it is reasonable to believe defendant felt himself under an identical compulsion. In this connection, it bears noting that Inspector Michael Urban, of the Office of the Inspector General for State Corrections, arranged the October 31st interview.
It is also noteworthy that the detectives, notwithstanding the unchanged conditions of defendant’s incarceration, nonetheless thought it appropriate to administer Miranda warnings, prior to the start of the interview on November 7, 1997 while defendant was ostensibly still a witness concerning the drive-by shooting. The People, who have the burden, have offered no evidence to dispel the likelihood that defendant believed he had no choice but to attend the interview. Therefore defendant’s first statement on October 31, 1997 concerning the bogus drive-by shooting is suppressed in the absence of Miranda warnings.
C. The Huntley Hearing: The November 7, 1997 Visit
As to the second visit on November 7, 1997, defendant contends that his post -Miranda statements should likewise be suppressed. Putting forth as his basis the “cat out of the bag” theory that his subsequent statements on November 7th were tainted and inspired solely by his earlier disclosures on October 31st, under the reasoning articulated in People v Chapple (38 NY2d 112 [1975]). Finally, defendant argues that he should have received not only one, but two separate Miranda warnings during the detectives’ second visit on November 7th. Defendant contends that the first waiver was referable only to the Curtis Gibson “drive-by” shooting, and that a second Miranda warning was required prior to any questioning about the Radio *735 Shack robbery, which was, after all, a completely different crime.
By advancing this argument defendant impliedly contends that he only waived his Miranda rights for the limited purpose of enabling him to elaborate on the fictional drive-by shooting, but not for the Radio Shack robbery. This is a meritless claim. People v Lopez (116 AD2d 592 [2d Dept 1986]) makes it clear that the police are not required to administer additional Miranda warnings before expanding the scope of their questioning to encompass another crime. Consequently, defendant’s reasoning lacks legal support.
Actually, there were not two distinct crimes under investigation, as was the case in Lopez (supra), but only one crime, the Radio Shack robbery, and defendant knew it. The theory that he waived his Miranda rights solely to perpetuate a cover story for the Radio Shack robbery is illogical. Further, the fact that prior to the November 7, 1997 interview the officers informed defendant of discrepancies in his portrayal of the drive-by shooting would alert the defendant even more acutely that the officers might well be coming dangerously close to the truth of his participation in the Radio Shack robbery. Despite their obfuscation, both sides were aware that the drive-by shooting was merely defendant’s cover story for the Radio Shack robbery, which remained the true and obvious purpose underlying the detectives’ visit.
Therefore, defendant’s waiver at the start of the November 7th interview is found to cover all subsequent statements made by defendant on that date. To find otherwise would lead to the anomalous result that while under Lopez (supra) a defendant could be questioned for an unrelated crime without fresh Miranda warnings, the instant defendant could benefit from his attempted deception so as to entitle himself to a higher degree of constitutional protection. Such a result is clearly unacceptable.
Since defendant was questioned about the Radio Shack matter shortly after the Miranda warnings, his custody must be deemed continuous with no new warnings required (People v Baker, 208 AD2d 758 [2d Dept 1994]). Furthermore, defendant was reminded of his Miranda rights by Detective Turnbull less than two hours later. As attested by defendant’s signed acknowledgment only a half hour elapsed between 11:40 a.m., the time Miranda warnings were completed, and the end of defendant’s first November 7th statement. Nor did the 10-to-15-minute lunch period in the midst of defendant’s rendition of *736 the drive-by shooting require fresh Miranda warnings. The time elapsed was brief, and there was in reality only one crime under discussion, both before and after the lunch pause. Considering that the last of defendant’s November 7th statements ended within five hours of Detective Petrak’s initial Miranda warnings, the inexorable conclusion is that defendant knowingly, intelligently and voluntarily effectively waived his rights as to his subsequent statements.
Finally, as to defendant’s argument that the first interview on October 31st tainted the second interview one week later, because defendant would feel that “the cat was out of the bag”, i.e., that he had already implicated himself, it is more than likely that defendant felt he had used the October 31st interview to his advantage in leading his police interviewers off the trail. By contrast, in Chapple (supra), defendant’s post-Miranda rights confessions were the product of a single continuous chain of events beginning with an apparently illegal arrest, questioning and confession without Miranda, followed without interruption by questioning and confession with Miranda, all on the same date. Moreover, in the instant case a week went by between the two interviews, thereby attenuating any possible illegality.
Therefore, suppression is granted as to defendant’s written statement of October 31, 1997, but denied as to all of defendant’s statements obtained on November 7, 1997. Defendant’s request for a Dunaway hearing is denied for the reasons stated.