■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v BRUCE M. INSONIA, JR., Appellant. [716 NYS2d 791] —Cardona, P. J. Appeal from a judgment of the County Court of Fulton County (Giardino, J.), rendered April 21, 1999, upon a verdict convicting defendant of the crimes of murder in the second degree, manslaughter in the first degree, kidnapping in the first degree, burglary in the first degree, robbery in the first degree, grand larceny in the fourth degree and burglary in the second degree.

On May 23, 1998, defendant, who was then 16 years old, entered the residence of 77-year-old Robert Wittemeyer (hereinafter the victim) with a friend, Ronald Johnson, and alleg-

edly stole the victim's wallet and car keys. Defendant and Johnson allegedly returned to the victim's home on May 25, 1998 and stole the victim's car as well as some money. At that same time, they allegedly assaulted the victim, tying him to a chair and piling furniture and clothes on him resulting in his death.

On May 27, 1998, after obtaining information implicating defendant in the burglaries at the victim's home, Richard Miles, a detective with the Gloversville Police Department in Fulton County, located defendant and asked him to go to the police station for questioning. Defendant agreed and voluntarily got into Miles' patrol vehicle. At the station, Miles brought defendant to an interview room where he read defendant his *Miranda* rights. According to Miles, defendant responded that he understood his rights and was willing to speak without an attorney present. Defendant proceeded to give an oral confession and two written statements admitting his involvement in the burglaries and death of the victim.

Thereafter, defendant was charged in a 10-count indictment and, following a *Dunaway / Huntley* hearing (*see, Dunaway v New York*, 442 US 200; *People v Huntley*, 15 NY2d 72), County Court denied defendant's motion to suppress his oral and written statements. Defendant was subsequently convicted of murder in the second degree (felony murder), manslaughter in the first degree, kidnapping in the first degree, burglary in the first degree, burglary in the second degree, robbery in the first degree and grand larceny in the fourth degree. He was sentenced to concurrent terms of imprisonment of 25 years to life for murder in the second degree and kidnapping in the first degree, 12½ to 25 years for manslaughter in the first degree, burglary in the first degree and robbery in the first degree, 1⅓ to 4 years for grand larceny in the fourth degree and a consecutive sentence of 7½ to 15 years for burglary in the second degree.

On appeal, defendant contends that his oral and written statements should have been suppressed because the police isolated him from his family and used deceit and trickery to prevent his parents from having contact with him during the interrogation. Initially, we note that a 16 year old is legally an adult (*see, People v Page*, 225 AD2d 831, 833, *lv denied* 88 NY2d 883) and the police are under no obligation to allow friends or family to communicate with a competent adult while he or she is in custody (*see, People v Sticht*, 226 AD2d 838, 840, *lv denied* 88 NY2d 995). Moreover, "a refusal by the police to allow a parent to see his child [does] not amount to a denial of

counsel so as to render any subsequently obtained confession per se inadmissible" (*People v Townsend*, 33 NY2d 37, 42). Nevertheless, suppression of incriminating statements made by a young defendant during questioning may be available where he or she is isolated from supportive adults and "the isolation result[s] from official deception or trickery" (*People v Salaam*, 83 NY2d 51, 55; *see, People v Bevilacqua*, 45 NY2d 508, 513-514). Contrary to defendant's claim, we do not find that the evidence herein establishes that the police employed deceit or trickery in an effort to isolate defendant from his parents.

Defendant's mother testified that Miles spoke with her at approximately 3:00 P.M. on May 27, 1998 indicating that he was looking for defendant and wished to question him about a burglary. He gave her his card asking her to call him if she found defendant and stating that he would call her if he located her son. She called Miles' desk phone at approximately 3:45 P.M. and spoke with Donald Van Deusen, another police officer, who told her to hold on and he would look for Miles. She waited on hold until the phone eventually disconnected. Thereafter, she made a number of unsuccessful attempts to call back. She telephoned the station number and told the person who answered that she was looking for Miles. The person indicated that Miles was busy and she asked that Miles call her back. She tried Miles' desk phone again, without success. She called the station number again and spoke with the dispatcher at the Sheriff's Department to whom the call had been forwarded. She advised the dispatcher that she would keep trying Miles' desk phone. Her last call to the police station was at approximately 4:45 P.M.

Defendant's father testified that he received a message from defendant's mother at approximately 5:45 P.M. on May 27, 1998 relating that she believed Miles had picked up defendant for questioning concerning a burglary. Defendant's father arrived at the police station at approximately 6:20 P.M. and asked to see Miles. Miles advised that he was questioning defendant in connection with a murder and denied the father's request to see his son. According to defendant's father, he told Miles that he wanted to get a lawyer and Miles responded that that would not be necessary since defendant was cooperating nicely. At approximately 6:45 P.M., defendant's father left the police station and returned home where he telephoned an attorney who agreed to represent defendant. That attorney called the police station sometime after 7:00 P.M.

On the other hand, Van Deusen testified that defendant's

mother called Miles' desk phone sometime between 7:25 P.M. and 9:15 P.M. on May 27, 1998 while he was conducting another interview. He put her on hold and went to look for Miles. When he returned a few minutes later, the phone was no longer blinking and defendant's mother was not on the line.

Miles was never asked during the suppression hearing whether he told defendant's mother when he met her on May 27, 1998 that he would call her if he found defendant. Miles testified that he located defendant at approximately 3:45 P.M. on that date and brought him to the police station for questioning. He stated that, after he read defendant his *Miranda* rights, defendant gave an oral confession. Jeffrey Shepardson, a police detective who took defendant's written statements, testified that he began interviewing defendant at approximately 4:27 P.M. and that, after administering *Miranda* warnings, defendant responded that he understood and agreed to speak without an attorney present. Shepardson took the first statement in a question and answer type format. He printed the statement and had defendant recite the first few lines so that he could verify that defendant could read. After making corrections, defendant signed the statement at approximately 5:35 P.M. Upon receiving further information regarding the extent of the crimes, Shepardson asked to speak with defendant again at 6:44 P.M. He again administered *Miranda* warnings and defendant agreed to be interviewed without an attorney. Defendant's second written statement concluded at approximately 6:53 P.M.

Edgar Beaudin, the police lieutenant in charge of the investigation, stated that prior to notarizing defendant's first statement, defendant indicated that he had read and understood it. Defendant was asked to give a second statement, which was completed at approximately 6:53 P.M. According to Beaudin, he was not aware that defendant's father had come to the police station until after both statements were completed. He was aware that an attorney had called the station on behalf of defendant and that there was no further questioning of defendant after that phone call.

In our view, the foregoing does not demonstrate that the police deliberately concocted a scheme to segregate defendant from his family in order to exact an inculpatory statement (*see, People v Dearstyne*, 230 AD2d 953, *lv denied* 89 NY2d 921; *People v Page*, 225 AD2d 831, *supra*). From the very beginning, Miles informed defendant's mother that, upon locating defendant, he intended to question him in connection with a burglary and gave her his card. The fact that she had difficulty

reaching Miles by phone is not indicative of a plan to preclude her from having contact with her son. Defendant's father arrived at the police station after defendant had been brought to the interview room and had given the first statement. The police had not concluded their questioning at the time that defendant's father requested to see him and were under no obligation to allow him to see defendant at that time (*see, People v Sticht*, 226 AD2d 838, 840, *supra*). Although Miles allegedly told defendant's father that an attorney was not necessary because his son was cooperating, Miles did not represent that defendant would be denied the right to speak with an attorney nor did the police continue to question defendant after the attorney called the police station. Significantly, defendant did not request to discontinue the interview or speak with an attorney at any time during the questioning. In light of the above, we find no reason to disturb County Court's suppression ruling.

Likewise, we find no merit to defendant's claim that he was deprived of a fair trial because his incriminating statements admitted into evidence were not voluntarily made by him. While defendant denied being advised of his *Miranda* rights prior to making the statements, the police officers who testified at the *Dunaway/Huntley* hearing stated that *Miranda* warnings were administered to defendant on at least three occasions. They further stated that, after making the written statements, defendant reviewed them, made corrections and signed his name. Defendant acknowledged at the suppression hearing that the officers asked him if he was under the influence of drugs or alcohol at the time of making the statements or if any promises, threats or coercion had been used by the police, to which he responded in the negative. Defendant further admitted that at the time of the interview, he knew that *Miranda* rights encompassed the rights to remain silent and to have an attorney. Viewing the totality of the circumstances herein, we find that defendant knowingly and voluntarily waived his *Miranda* rights (*see, People v White*, 261 AD2d 653, 654-655, *lv denied* 93 NY2d 1029; *Matter of Phillip J.*, 256 AD2d 654, 656-657).

Furthermore, we find no error in County Court's instruction that the jury disregard testimony relating to crimes allegedly committed by defendant at the victim's residence in November 1997. Evidently, the defense intended to use such evidence to establish that the fingerprints that the police found at the victim's residence in May 1998 could have been left there in November 1997. County Court, however, had previously

dismissed those counts of the indictment relating to acts allegedly occurring in November 1997. Since such counts were no longer before the jury, we find no error in the court's instruction. Notably, defendant was not hampered in his defense inasmuch as he was permitted to argue in summation that the fingerprints may have been left there on some other occasion.

We have considered defendant's remaining claims, to the extent that they have been preserved for our review, and find them unavailing.

Mercure, Peters, Spain and Graffeo, JJ., concur. Ordered that the judgment is affirmed.