Appellant (defendant) was found guilty by a jury under the second count of an indictment charging him with buying, receiving, concealing or aiding in concealing "Nineteen (19) 10/20 tires and Eight (8) lug blocks and accessories . . . of the total and combined value of, to-wit: $3800.00; the personal property of Jimmy Henderson, knowing the same had been stolen, and not having the intent to restore it to the owner." In the first count he was charged with larceny of the property. The court fixed his punishment at imprisonment for ten years and sentenced him accordingly.
That the property had been stolen there can be no doubt. The owner, Mr. Jimmy Henderson, a farmer living and farming at Prairie, Alabama, in Wilcox County, said that he was called to his farm on Monday morning, April 9, 1979, to find that his two soybean trailers had been jacked up, that nineteen tires and some of "the nuts and cleats that hold the tires on the trailer were gone." He said the value of each tire and attached rim was "between a hundred and fifty and two hundred dollars." He said he next saw the stolen property in two pickup trucks at the Marengo County Jail at Linden.
There was undisputed evidence that about midnight of April 8-9, 1979, two pickup trucks were halted by a deputy sheriff of Marengo County at Nanafalia on Highway 10 in Marengo County. The officer noted that the trucks were loaded with tires. One truck was being driven by defendant, the other by defendant's son, Preston Leon Harper. In the truck with the defendant was defendant's wife. The officer contacted the Marengo County Sheriff who told him "to bring them to the Marengo County Jail." The record shows that the particular officer and several other officers had been maintaining a lookout for the defendant and his son and trucks driven by them.
A large part of the transcript of the proceedings consists of hearings out of the presence of the jury in connection with defendant's objections to, or motion to suppress, testimony pertaining to what defendant said subsequent to his being stopped on the highway and testimony as to the contents *Page 152 
of the truck. A major ground for the objections and the motion was that there had been an illegal arrest of defendant, in violation of his rights under the Fourth Amendment to the Constitution of the United States. The same constitutes the essence of appellant's first two contentions for a reversal. We will discuss such contentions later.
Perhaps the clearest portrayal of the circumstances pertaining to the alleged crime is to be found in the testimony of the only witness for defendant, his own son who was driving the other truck. He testified that at the time of the trial he was then in the Mississippi State Penitentiary, serving a seventeen-year sentence for three cases of burglary in Lauderdale County, Mississippi. He testified in part as to the crime charged in this case:
 "Q. Do you recall coming to Alabama back in April of 1979 and you brought with you your mother and your father?
"A. I do.
"Q. And do you recall what day of the week that was?
"A. It was on a Sunday.
"Q. Now, at that time where were you living?
"A. Route 1, Toomsuba, Mississippi.
"Q. And where was your father living?
"A. Route 1, Toomsuba, Mississippi.
"Q. How far did you live from your father?
"A. About a quarter of a mile.
". . . .
 "Q. Did you make any plans to come to Wilcox County on that day?
"A. I did.
"Q. And what were those plans?
 "A. I had a call Sunday afternoon from a man who had been buying tires from me. And he asked me to meet him in Meridian. And I met him in Meridian. And he said he needed some tires.
"Q. Did he say what kind of tires he needed?
 "A. He was in the trucking business. He had been buying tires from me before. He said some of his trucks were getting in pretty bad shape on tires and he wanted to know did I have any.
"Q. What did you tell him?
 "A. I told him no that I didn't at the present time. And he wanted to know how long it would take to get some.
"Q. And what did you tell him?
 "A. I told him I thought I could get him some pretty quick.
 "Q. Did he indicate to you that he had to have them pretty quick?
"A. He did. He said he needed them right then.
"Q. After he told you this what did you do?
 "A. I told him I would try to have them for him the next morning. That I knew where I could probably get some and he had the cash money waiting for me he said just as soon as I gave him the tires he would pay me for them.
". . . .
 "A. All right. After I had done talked to the man and had come back to my house I loaded up the tire tools and jacks and blocks and stuff and went to my father's house. My mother and father were sitting in the back yard with my brother and his wife. And I walked up and my brother and his wife were getting ready to leave. And they lived right across there from my father there so they were just going to walk over to their house. And I told my father I needed him to run with me to haul a few truck tires.
"Q. Did you tell your father where you were going?
"A. No.
 "Q. And what did he say to you when you told him you needed him?
 "A. He said he didn't feel very good and didn't feel much like driving. I told him well he wouldn't have to be gone all that long. And we probably would be back pretty early if we leave early.
"Q. And what kind of health is your father in?
 "A. He just had a couple of major operations for intestinal blockage in his stomach. *Page 153 
He was a diabetic and he was having trouble getting his stomach to heal up where they had put stitches in his stomach. And really he wasn't supposed to be driving that much.
"Q. And did he have his own vehicle?
"A. He did. He had a pickup that I helped him buy."
He further testified that with his father and mother following him, according to his instructions, and after he had had the two trucks supplied with gasoline, they traveled into Alabama, passed through Sumter County, Choctaw County and Marengo County, and "there was a tool shed fairly close to where these tires were. These two trailers were parked under a shed." In his further testimony, the witness said that he had his father park the truck he was driving somewhat out of sight of the place where the trailers and shed were, that he didn't want his mother and father "to know I was going to break these tires down and steal them." He said he told his father that he was going "to meet a man to pick up these tires," that it didn't take him long to jack up the trailers and take the tires off, that he put nine of them in his pickup, took them to the other truck, switched trucks with his father, went back and put ten tires in his father's truck, then returned to the other truck and "told them to follow me." According to his testimony, the two trucks then returned over the same route and came back into Marengo County, when the following occurred:
 "A. When we got near Nanafalia we met a Sheriff's car. And we were near Compton's Store. So I pulled over at the store and the Sheriff's car had turned around and followed us. And whenever I stopped there they got out and arrested us. No, excuse me, I'm wrong there. It was raining. And they got out and wanted identification, driver's licenses. They didn't say we were under arrest at that time. It was raining real hard and they got back in the car and I guess they called for help because it wasn't but just a few minutes until there were several Sheriff's cars and deputy cars surrounding us and the store.
"Q. They stopped you with a blue light?
"A. Right."
According to further testimony of the witness, one of the officers asked for his driver's license and "said something about the tires on my truck." He told the officer he had bought them, that then "it really got raining hard so he said just get back in the truck. In other words, we were going to let the rain blow over." His father got out of his truck and into the truck the witness was driving and asked the witness what was going on. He said he told the defendant to tell the officers that "we bought the tires in Montgomery." The officers questioned the witness "maybe ten or 15 minutes as to where the tires had come from" and what he was doing with them, and he told them that he "bought the tires from a man I had met in Montgomery." After the questioning, the witness, his father and mother, went with one or more of the officers to the Marengo County Jail at Linden and remained there the rest of the night. About 9:00 A.M. the next morning, according to the witness, the officers let him know that they had not learned that the tires had been stolen and were in the process of arranging for some papers to hold the tires but release the witness, his father and mother. However, soon after 9:00 A.M., the officers told them that they had just learned that the tires were stolen. Charges were then made against the witness, his father and mother for their participation in the theft of the tires.
It can be seen from the testimony of the defendant's son, as to which there is little material conflict, that it is difficult to determine the precise moment of defendant's arrest. However, it is to be reasonably concluded, we think, that whatever the precise time thereof, there was probable cause for believing, and that the officers did believe, that defendant had participated in the crime of stealing or of buying or receiving stolen property. According to the testimony of officers, law enforcement personnel of at least five counties in West Alabama were aware of the repeated, continuous *Page 154 
and ever potential criminal conduct of defendant's son, and to some extent of defendant. They had the two, particularly the defendant's son, under observation and had learned during the afternoon or evening of Sunday, April 8, 1979, that the two trucks had left the homes of defendant and his son at Toomsuba, Mississippi, and were on the lookout for them in the five mentioned counties of Alabama. They were watching every crossing of the Tombigbee River between and including U.S. Highway 80 and U.S. Highway 84. The fact that they were known to be convicted felons as to a type of crime that had become recurrent, as it had become with them, was not in and of itself sufficient to justify an arrest of them while driving trucks along a country road in a farming section at midnight, when most farmers are known to be asleep, but it was a circumstance that increased the belief that they were not engaged in legitimate secular business at the time. When they became aware that the trucks were loaded with tires much too large to go on the small pickup trucks they were driving and were headed back toward Toomsuba, Mississippi, there was justification for stopping the trucks, detaining the drivers and inquiring of them as to what was taking place. There is no contention by appellant to the contrary.
Having lawfully detained them for questioning, they were told by defendant and his son that the tires had been obtained at Montgomery or from a man from Montgomery. The likely falsity of that information was obvious to the officers by reason of their knowledge of the environs of where they were at the time and of the location of Toomsuba, Mississippi, and that of Montgomery, Alabama. They could only reasonably conclude that in transporting tires from Montgomery to Toomsuba, without any ulterior purpose, the motorists would travel U.S. Highway 80. The officers were then justified in further detaining defendant for additional questions if he cared to answer them after the proper predicate had been laid, which he voluntarily did. The transcript is replete with evidence that he was given all advice and warnings as to his constitutional rights to an attorney and freedom from self-incrimination. This took considerable time, according to the evidence. The detention of defendant for an even longer time is understandable in view of the fact that his son and his wife were also there, presumably for the same purpose as he, whom he would not want to leave and who would not want to leave him.
The change of the scene of the detention from Nanafalia to the county jail in Linden was not unreasonable procedure. The place where they were was not suitable for further inquiry, upon consideration of the heavy rain then falling, no lights except from vehicles, no open house or shelter nearby, two pickup trucks that would have been left to the elements or worse, three persons in the trucks; the nearest facilities for the convenience and comfort of all concerned to have been found in Marengo County were obviously in Linden, the county seat. There was no suggestion otherwise; there is no contention to the contrary.
After all vehicles, including the two pickup trucks, had traveled to Linden and were secured, and all persons directly concerned with the further progress of the matter had arrived and become well settled and comfortable at the jail, whatever wavering there was as to what to do with defendant thereafter and until about 9:00 A.M. that morning was not because of any doubt as to his guilt of a felony but as to the identity of the victim, the establishment of which would have been a requisite to a formal charge, unless it could be averred therein that his identity could not be ascertained after reasonable effort. Their lack of knowledge as to the identity of the victim would hardly have been more of a barrier to a constitutional and legal arrest for larceny or the like than it would have been if they had seen a person unjustifiably kill another but did not know the victim's identity.
None of the cases cited by appellant is an authority for appellant's view that there was a lack of reasonable or probable cause for believing the defendant guilty of the *Page 155 
charge for which he was tried and convicted. He relies uponDunaway v. New York, 422 U.S. 200, 99 S.Ct. 2248,60 L.Ed.2d 824 (1979), and says that the Supreme Court ruled therein "that the actions of law enforcement officers in a similar situation were illegal." Any similarity of the facts in the instant case to those in Dunaway, supra, pale in the glare of the dissimilarities. In Dunaway, a man had been killed during an attempted robbery on March 26, 1971. On August 10, 1971, an officer had told another officer that an informant had supplied a possible lead implicating Dunaway in the crime. The second officer questioned the informant but "learned nothing that supplied enough information to get a warrant for petitioner's arrest." Nevertheless, the officer ordered other detectives to "pick up" petitioner and "bring him in," which they did. While Dunaway was thus in custody, the officers obtained a confession or other incriminating extrajudicial statement from him. The Court held that there had been an exploitation of the arrest in order to obtain the extrajudicial statement.
Rudolph v. State, Ala.Cr.App., 371 So.2d 962 (1979), also relied upon by appellant, is also inapt. The question decided there was as to the legality of a search of the defendant's automobile, not as to the legality of an arrest of defendant. In the instant case, there was no need to search the trucks. The stolen property thereon was in open view.
Cases in which officers have arrested an accused about whom they have heard some evil but have seen no evil are not precedents for a case, such as this one, in which they have been convinced upon reliable information that the accused is in the process of an attempt to commit, or is committing, a felony and they actually see him in the commission of such felony accompanied by the visible fruits of the felony.
The State was allowed, over objections of defendant, to introduce in evidence a tape of an incriminating statement made by defendant on the morning of April 9, 1979, and to play the tape in the presence of a jury. It was obvious from the very beginning, as it so often is, that there were flaws in the tape or in the phonographic reproducing apparatus. Before any substantial progress could be made, the jury was excused for lunch. During that time, a smaller machine was substituted for the one previously started in the presence of the jury. Again an effort was made to play the tape in the presence of the jury, but it proved to be unsatisfactory, and the jury was again excused. During the intermission, the court suggested that the machine be connected with the public address system in the courtroom. When this was done and tested, it was obvious that the amplification of the voice of defendant or the voice of his questioner, or both, would prevent a satisfactory understanding by the jurors, while in the jury box, of what was asked by the questioner and answered by the defendant. The court then decided for the jury not to sit in the jury box but in the back of the courtroom, and upon the return of the jury to the courtroom, the following, inter alia, occurred:
 "THE COURT: If y'all will have a seat in the back three rows, in the back corner of the room there, we'll try to play this tape for you through the speaker there and see if we can do it better. Just have a seat anywhere in the last three rows. You'll just have to stay there temporarily.
 "Now, what we are going to try to do at this time is this recording has been admitted into evidence. And it's important that you hear whatever is there. Now, I understand that even if the volume is as loud as it can conceivably be there may be some parts there that nobody can understand. But that is not for me to say. It's up to you to make the determination of what you can understand and if you are able to understand what is there with a sufficient degree of clarity to at least understand what is there. And we have a PA system here in the courtroom. . . . And we'll play it through and then after we have finished I'll ask you about what you heard.
 "(Whereupon State's Exhibit No. 7 was played through the courtroom's PA system). *Page 156 
 "THE COURT: Ladies and gentlemen, would you return to the jury box, please?
"(Compiled).
 "THE COURT: Now, I'm going to ask you ladies and gentlemen again or first of all I want to thank you for your patience, you have been mighty patient and I do thank you for that. But what — how do you feel now? Could you hear what was said on that tape on that occasion?
"JUROR: Much better.
 "THE COURT: Is there anyone that feels that you could not hear it and if so please let me know.
"(No response).
"THE COURT: All right.
"JUROR: I could hear it better too.
 "THE COURT: All right. Thank you. Now, was there any one of you that could not hear at least what was there, what sounds were there; if so I need to know that.
"(No response).
"THE COURT: All right. You may proceed.
 "MR. FAIL: Judge, I would like to make a motion outside the presence of the jury.
"THE COURT: Tell me what your motion is.
 "(Whereupon an off-the-record discussion was held between counsel and the court).
"MR. FAIL: I withdraw that request, Your Honor.
"MR. GREEN: He's your witness; I'm through."
Thereupon, cross-examination by defendant of the witness on the stand was completed, the State called another witness and after he completed his testimony, the State rested. At that time, out of the presence of the jury, defendant moved the court to exclude the evidence and included in his argument on the motion, a motion to exclude as evidence that which had been played to the jury from the tape. The gist of his argument on the point is now contained in his brief in the following statement:
 "Without regard to the fact that the statement of the Appellant should have been suppressed and not allowed into evidence the tape which was presented to the Court was so inaudible that same should have been rejected and not allowed."
In response to defendant's argument in support of his motion to exclude the evidence of the conversation reproduced by the recorder and transmitted via the PA system, the court said:
 "As far as the playing of the tape for the jury, it was done twice. The first time the jury generally acknowledged when they were questioned by the Court that they could not — It wasn't a question so much of understanding, they just couldn't hear what was being said on the tape and I couldn't hear what was being said either. But of course it was closer to the jury and directed to them. Now, I think when we played the tape through the PA system that is available here in the courtroom that what was there, whatever it was was available to be heard and could be heard by anybody not deaf. Now, whether or not it was completely understandable — to the person that tried to transcribe it it was definitely not. I made numerous notations on the paper and I didn't catch them all I'm sure. Now, I allowed it into evidence for whatever weight and value and credibility the jury wants to give it and understanding there are some parts there that nobody on this earth could understand. But whatever is there, whatever groans and grunts and utterances are there are there for their consideration. And your motion is overruled."
There is no claim, and we find no reasonable basis for a claim, that the reproduction by the playing of the tape of the conversation between defendant and his questioner contained any material additions to or any material omissions from the purportedly recorded conversation. It appears that none was brought to the attention of the trial court. The trial court expressed, and the jury indicated, reasonable satisfaction therewith. Similar problems, though not exactly like the one here presented, have been presented in other eases. In the *Page 157 
absence of any showing or claim that any material part of the conversation was not audible to the jury or that some material part of the verbalisms heard by the jury was not a part of the particular conversation between the questioner and the defendant, we are confident there was no error prejudicial to defendant in overruling his objection to the evidence and his motions to exclude it.
There is no merit in appellant's contention that there was no proof of the proper venue. There was definite evidence that the tires were stolen in Wilcox County. Furthermore, "When property is stolen in one county and carried into another, venue is in either county." Code of Alabama 1975 § 15-2-9. The offenses charged in the indictment were "ambulatory." Milam v. State,240 Ala. 314, 198 So. 863 (1940); Holt v. State, 49 Ala. App. 582, 274 So.2d 356, 359, cert. denied, 290 Ala. 367,274 So.2d 360 (1972); Weeks v. State, Ala.Cr.App., 346 So.2d 1181 (1977).
Another contention made by appellant is that the court erred "in denying appellant's motion for new trial concerning jury conduct." In the pertinent part of the motion for new trial, the movant stated:
 "8. Defendant's right to a fair and impartial trial was prejudiced by the sitting on said jury of a person employed by the Wilcox County Sheriff's Office and who was present with and came in contact with Defendant at the jail during the course of the trial and by the failure of said juror to properly respond to questions concerning separation when Court was in recess.
 "9. Defendant's right to a fair and impartial trial was prejudiced by members of the jury visiting the jail and having a conversation with one of Defendant's witnesses."
The jury was selected in this case on Wednesday, February 20, 1980. After its selection, with the consent of the prosecution, the defendant and defendant's attorney, the jury was excused and allowed to separate, under plenary instructions by the court as to their duties and behavior during their separation and an order of the court that they were to return at 9:00 A.M. on Friday, February 22, which they did. Trial was then commenced and was concluded that day by the verdict of the jury and the judgment of conviction and sentence. On February 28, defendant's counsel informed the court that he intended to file a motion for a new trial in which there would be allegations as to "the improper conduct of some of the jurors in the case which was in direct violation of the Court's instructions," and he would like to present the testimony of Preston Leon Harper at that time as he would "be taken back to Mississippi shortly." In accordance with the request, the testimony of Preston Leon Harper was taken at that time. He said that about noon on the Friday of the trial, while he was incarcerated in the Wilcox County Jail, two men, whom he afterwards noted were on the jury trying the instant case, came to the jail and inquired of him and other inmates as to their food and other treatment in the jail. He said also that he learned that a third juror was a jailer at the Wilcox County Jail but that he had no contact with him until after the trial.
Immediately after testimony of Preston Leon Harper, the attorney for defendant testified. When questioned by the court, his testimony was in part as follows:
 "Q. Had you made the determination that in fact the man serving on the jury was at that present time employed as a jailer?
 "A. We had made the determination that we thought — I don't know that he was employed at the jail; but that he had some business or some connection with the Sheriff's Office and the jail.
 "Q. And was having personal contact with your client in jail?
"A. Possibly, yes, sir.
 "Q. You knew that before you tried the case on Friday, didn't you?
"A. Well, I assumed, Your Honor, when I asked —
 "Q. (Interposing) I'm not asking about your question. I'm saying you knew that when you tried the case on Friday morning didn't you? *Page 158 
"A. Yes, sir."
The motion for new trial was filed on March 13, 1980, and was set for hearing on June 5. At the commencement of the hearing, counsel for defendant informed the court that defendant "had filed a complaint or grievance against me before the Bar." The defendant interposed:
 "At the time I filed that there were some things I didn't know. And I made a mistake. And I would like for Mr. Faile to continue the case."
After further, colloquy, defendant stated that he was satisfied with the services and advice of his attorney and had no "reservations about that whatsoever," and the court proceeded with the hearing on the motion for a new trial. A juror in the case, Colvin C. Towns, was called as a witness by defendant and testified that he was employed as jailer and dispatcher by the Sheriff's Department during the month of February, and he recalled defendant as an inmate. He said that defendant required medication, which he gave the defendant, and on one occasion took him "to the doctor for a shot." He further testified:
 "Q. So there's no question then that you and he knew who each other were and what you did there during the course of the trial, is that correct?
"A. Right.
 "Q. Now, did you at any time discuss the case with this defendant?
"A. Once after the trial.
 "Q. After the trial. But not any time before the trial?
"A. Not any time before the trial."
There was also testimony by two other jurors who were on the jury that tried the defendant, presumably the two that defendant's son said visited the jail about noon on the Friday of the trial, who said in effect that they just went over to the jail to look around, that they did not talk with anyone in the cells of the jail.
Our review of the transcript convinces us that if any of the jurors visited the jail during the trial of defendant and talked with a witness for defendant [defendant's son], it was a mere casual conversation with no relation whatever to the issue in the case or any person involved in the case. The contention made by ground 9 of the motion for new trial is not substantiated.
It was indecorous and likely productive of injustice for a juror in a particular case to be at the same time serving as a jailer in such a way as to come in contact with a defendant on trial, but we are persuaded that no harm was thereby done to defendant in this particular instance. The particular juror should have made an affirmative response to the question asked by defendant's counsel on assembly on Friday morning of the trial as to whether he had had any contact or conversation with defendant. The question to which there was no response was:
 "I would like to ask you have any of you been around Mr. Harper or had any contact with Mr. Harper or had any conversation with Mr. Harper or any members of his family or to be in a crowd of people who were in his presence?"
The meaning of the question is rendered more obscure than it would have been if its five components had been asked as separate questions. Adding to any confusion is the fact that there was more than one "Mr. Harper." We are not persuaded that there was anything devious about the juror's silence at the time. Furthermore, defendant was as aware of the truth as to the facts inquired about as was the juror himself.
In emphasizing that there was a burden upon the State to show that "separated jurors were not subject to influence or contacts which might have swayed them in reaching their verdict," appellant relies upon Pennington v. State, Ala.Cr.App., 368 So.2d 866 (1978). In that case, appellant did not consent to a separation; in the instant case he did.
In our opinion, defendant's right to a fair trial was not "prejudiced" as alleged in ground 8 of defendant's motion for a new trial. *Page 159 
In a brief portion of his brief, appellant asserts that the trial court committed error in permitting testimony as to "the search of Appellant's truck on which the tires were located." There was some reference in the testimony to a "search," but, as previously shown, there was no need for any search. The tires were in open view. They were identifiable in gross by the owner thereof. The record shows that defendant voluntarily gave his consent to a search, after all of his constitutional rights had been explained to him and appropriate warnings against any relinquishment of his rights were given him. The action complained of does not constitute prejudicial error.
Our review of the record fails to reveal any error prejudicial to defendant. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge Leigh M. Clark, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur.