803 F.2d 714
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Appellee,
v.
Walter Anthony REYES, Appellant.
 No. 85-5241.
 United States Court of Appeals, Fourth Circuit.
 Argued May 8, 1986.
Decided Oct. 14, 1986.
 
 Dale E. Sanders, for appellant.
 Stephen Winerip, Special Assistant United States Attorney (Justin W. Williams, United States Attorney; William G. Otis and Kenneth E. Melson, Assistant United States Attorney on brief), for appellee.
 E.D.Va.
 AFFIRMED.
 Before WINTER, Chief Judge, and RUSSELL and PHILLIPS, Circuit Judges.
 PER CURIAM:
 
 
 1
 The appellant Walter Anthony Reyes entered his plea of guilty to an indictment charging him with possession of cocaine with intent to distribute in violation of 21 U.S.C. Sec. 841 (a)(1), reserving the right to appeal the district court's denial of his motion to suppress evidence.[1] He was convicted and sentenced to a term of imprisonment.
 
 
 2
 Reyes has appealed, raising the following issues: 11(1) Whether the evidence of objective facts known by the government agents at all 3 positions of the detention, was sufficient to justify a reasonable, articulable suspicion that the Defendant was engaged in criminal conduct, (11) Whether the 3 position encounter at National Airport between the Defendant and three government agents amounted to a non-consensual detention. (III) Whether the inculpatory admissions and the surrender-seizure of narcotics obtained from the Defendant at position three were the product of the unlawful detention."
 
 
 3
 Following customary practice, a Drug Enforcement Administration Special Agent, assigned to the Drug Enforcement Administration National Airport Detail, was observing passengers at the Washington National Airport, looking for persons who might be drug couriers arriving on flights from known "source cities, " such as Miami. The Agent had received special training in the identification of narcotics traffickers. He was at the time working with a United States Park Police Detective and a Federal Aviation Administration Detective. The officers were not in uniform and no guns were visible. The Agent observed a black male who had deplaned from a flight originating in St. Lucia with stops in Port de France and Miami. His attention was attracted to this individual because of his conduct, obviously trying to appear very nonchalant, in spite of his apparent nervousness. He was whistling, taking his time walking up the stairs, looking around at everybody and everything that was going on around him. He was carrying a shoulder bag and wearing a jacket and painters pants. As he came up the stairs he looked at the Agent, and when he reached the top of the stairs he looked at the Agent again, and as he walked toward the terminal he turned his head and looked at the Agent a third time. He appeared nervous and apprehensive. He was later identified as Reyes, the defendant. The Agent and the two Detectives followed Reyes from a distance of approximately 20 to 25 feet through the terminal toward the exit. Reyes kept looking over his shoulder at the three officers, trying obviously not to look directly at them.
 
 
 4
 Before reaching the exit, Reyes entered a telephone booth but did not remain in the booth long enough to have spoken to anyone. He proceeded outside to the taxi stand. When he reached the taxi area he turned all the way around, looking toward the Agent, and then turned back toward the taxi stand. The Agent approached Reyes at this point, and in a mild tone of voice, asked if he could talk with him. The Agent identified himself as a law enforcement officer.
 
 
 5
 The Agent was behind Reyes and did not block Reyes ' means of exit. One of the Detectives was behind the Agent and the other Detective was some eight feet away. The Agent did not display any firearm or weapon. Reyes testified that he became aware that the officers were carrying weapons when he observed one of the officers behind the Agent with his sports jacket open, constantly moving his jacket so that a gun in its holster was "flashing" though the gun was not drawn. Reyes said he considered the exposure to be a "threat." He admitted on cross-examination that he was thoroughly cognizant of the fact that law enforcement officers customarily were armed. The Detective testified that his gun was in its holster on his hip underneath his unbuttoned sports jacket; that he had his arms folded across in front of him most of the time and there was no way Reyes could have seen the gun.
 
 
 6
 The Agent proceeded with his questioning. He asked Reyes for identification. Reyes was visibly unnerved and asked "what for?" The Agent responded that there was a particular problem with drugs coming into the area and that he [Reyes] looked "the type of person that I would be looking for." The Agent asked him again if he would mind speaking with him and Reyes consented. The Agent asked him where he had come from and he said Miami. He then asked Reyes his name and after some hesitation he replied "Earl Thomas." Because of his demeanor and his hesitation before answering, the Agent did not believe him. Reyes said he had no identification. Upon request for his airline ticket, he produced a boarding pass in the name of Earl Thomas. He later produced a plane ticket issued to Earl Thomas. The Agent again advised Reyes the reason for stopping him. The Agent asked for permission to search Reyes' shoulder bag. He consented. One of the Detectives searched the bag while the Agent continued questioning him. Nothing was found in the shoulder bag, to the obvious relief of Reyes.[2] The Agent asked him his address in the District of Columbia and, after hesitating, he gave him an address. Again the Agent had doubts about his truthfulness. After about 3 to 5 minutes the Agent asked Reyes if he would mind stepping inside the terminal to a point still in a public thoroughfare no more than 15 feet from the original point of contact but out of pedestrian traffic. He was asked his occupation and he responded that he was a musician. He then was asked why he went to Miami and he said he had gone to "play a set." He, was carrying no musical instrument or anything else that would indicate that he was a musician. The Agent then asked Reyes whether he had any drugs on him. Reyes replied that he did in his cigarette pack and upon request of the Agent he attempted to find the cigarettes, reaching for a side pocket in his painters pants. As he did this, the Agent noticed that Reyes was leaning back and contorting his body while reaching down as if to keep his jacket from falling open. He also observed a bulge in Reyes ' jacket. Reyes pulled a cigarette pack out and said, "this is not the one. I must have thrown the other one away." The Agent said "well, what is this?" pointing with his hand toward the jacket pocket. At no time did he touch him. Reyes then reached in his jacket pocket and pulled out a clear packet of white substance, which appeared to the Agent to be cocaine. Reyes was then placed under arrest. The Agent told Reyes that if he had any more of the packets, he should give them to him. Reyes pulled out another packet similarly wrapped. He reached into another pocket and pulled out another packet. Reyes was taken to the Federal Aviation Administration Airport Police Office where he was advised of his Miranda 6rightsandsearched. No additional cocaine was found.
 
 
 7
 Upon motion of Reyes to suppress the cocaine found on him, the district court denied the motion, saying
 
 
 8
 I doubt that under Roger 33andMendenhall 4andDunaway 5thatthiswas a seizure. There is no show of physical force or authority, which in my opinion would justify a reasonable person in feeling that he was not free to leave....
 
 
 9
 The Court further noted that even if the encounter were a seizure, it was justified by articulable suspicions.
 
 
 10
 This appeal followed. We affirm.
 
 
 11
 In passing on defendant's suppression motion, the evidence must be viewed in the light most favorable to the government, Glasser v. United States, 315 U.S. 60 (1942). The evidence in this case clearly sustains the court's finding that there was no seizure at least up to the time the defendant produced the packet of cocaine. The investigative encounter throughout was consensual, no force was used, no show of authority was exercised, and the defendant was not restrained. The encounter occurred during the daytime, in a public place and was of short duration. The officers were not in uniform, they displayed no weapons, they did not touch the defendant or block his way. His nervousness, his futive glances, his demeanor, his delay in giving his name and address, his actions generally, no identification, claiming to be a musician without any instruments or other equipment usually carried by a musician, all sustained an articulable suspicion of criminal activity and was more than a mere similarity of a drug courier profile. The findings of the district court cannot, therefore, be said to be clearly erroneous.
 
 
 12
 The judgment of conviction of the defendant is accordingly
 
 
 13
 AFFIRMED.
 
 
 
 [1]
 Fed.R.Crim.P, 11 (a)(2)
 
 
 [2]
 The used boarding pass and the used plane ticket were not returned to defendant. The officers were in the act of returning the shoulder bag at the time the defendant incriminated himself
 
 
 [3]
 Florida v. Royer, 460 U.S. 491 (1983)
 
 
 [4]
 United States v. Mendenhall, 446 U.S. 544 (1980)
 
 
 [5]
 Dunaway v. New York, 442 U.S. 200 (1979)
 
 
 [6]
 Miranda v. Arizona, 384 U.S. 436 (1966)