363 S.E.2d 729

**In the Matter of MARK E.P.**

**In the Matter of JOHN A.L.**

**Nos. 17170, 17171.**

Supreme Court of Appeals of
West Virginia.

Nov. 18, 1987.

---

**654**

David M. Katz, Bluefield, for plaintiff.

Janet Steele, Asst. Atty. Gen., for defendant.

PER CURIAM:

This is an appeal by two juveniles who at a joint hearing were transferred to adult criminal jurisdiction on the charge of murder. We previously considered the issue of their transfer after their first hearing in *Matter of Mark E.P.*, 175 W.Va. 83, 331 S.E.2d 813 (1985),[1] and remanded the case for further development of the circumstances surrounding confessions given by each of the juveniles. At the conclusion of the second transfer hearing the trial judge again ruled that both confessions were admissible and established probable cause to order the youths transferred to adult criminal jurisdiction. The petitioners once again

seek a review of this decision in a direct appeal as provided in *W.Va.Code*, 49-5-10(f).

In our earlier review of this case we were specifically concerned with whether the confessions were given in conformity with the principles enunciated in *State v. Ellsworth J.R.*, 175 W.Va. 64, 331 S.E.2d 503 (1985):

> Under *W.Va.Code*, 49-5-8(d),[2] when a juvenile is taken into custody, he must immediately be taken before a referee, circuit judge, or magistrate. If there is a failure to do so, any confession obtained as a result of the delay will be invalid where it appears that the primary purpose of the delay was to obtain a confession from the juvenile.

Syl. pt. 3, *supra*.

Both juveniles were charged with the murder of Lutricia Dickens on June 29, 1983 "by tying her to a bed in her home, pouring gasoline on the bed, and then setting it on fire." *Mark E.P., supra*, 175 W.Va. at 85, 331 S.E.2d at 815. After a week of investigation, the police focused on Mark E.P. and John A.L., both of whom were sixteen years old, as their prime suspects. On the morning of July 6, 1983, Officers Helton and Poe went to Mark E.P.'s place of summer employment at the sewage treatment plant at 9:30 a.m. and asked him to go to the police station to discuss Ms. Dickens' death. They informed him that he was not under arrest, then obtained permission from his employer for him to leave work and promised to bring him back.

They drove him to the station without discussing the case and took him into Detective Helton's office. When asked if he wanted to contact his mother, Mark E.P. said that "I didn't want her to hear what I had to say." Helton read to him each of the *Miranda* warnings, then had him initial each right and sign his name at the bottom

---

1. See this case for a more complete account of the facts.

2. *W.Va.Code*, 49-5-8(d), in pertinent part, states:
 A child in custody must immediately be taken before a referee or judge of the circuit court and in no event shall a delay exceed the next succeeding judicial day: Provided, That if there be no judge or referee then available in the county, then such child shall be taken immediately before any magistrate in the county for the sole purpose of holding a detention hearing.

of the page. Helton testified that no promises were made and that Mark E.P. appeared "normal" and understood what he was signing.

The youth then proceeded to give a narrative account of his activities on the day the victim was killed and the events he witnessed in her house just prior to the fire, which Helton transcribed. Mark E.P. read the four-page statement, initialed minor changes and then signed it at approximately 11:30 a.m. He was placed under arrest and transported to the magistrate's office in Princeton for arraignment sometime after 1:00 p.m. In transit Mark E.P. commented that John A.L. had discussed robbing the victim prior to going to her home and also described certain physical items taken by John A.L.

Under cross-examination, Detective Helton provided the following additional facts. He had spoken to Mark E.P. on two earlier occasions at locations other than the police station and on the day prior to his arrest Helton and Poe attended a meeting at the prosecuting attorney's office when it was determined that a statement was needed from one of the youths. Mark E.P. was not taken directly to a magistrate because he was not under arrest; he was told he was a "prime suspect" before he signed a statement; he was never advised that he was free to leave but Helton was "sure he knew it"; Helton's office door was open but not two outer doors which led to the outside. Either Helton or Poe, or both officers, were always present with Mark E.P. Following his arrest he was not presented before a magistrate until after lunch. Mark E.P. was not advised prior to his confession that he could be charged as an adult with first degree murder.

Mark E.P. appeared at both transfer hearings for the limited purpose of explaining under what circumstances his statement was made and provided the following testimony. Before taking him to the station Helton told him, "You told us a lie the first time" and Mark E.P. agreed. Both officers escorted him from the police car

into Helton's office, each walking at his side. The officers told him that if he gave a statement "they would tell the court that [he] had cooperated with them," and then half-way through his statement the officers disputed his story. He maintained that certain portions of Helton's transcription were inaccurate but nevertheless signed it because he was "nervous and upset" and "[t]hey was making me say things that I didn't want to say."

## I

Petitioner, Mark E.P., challenges the admissibility of his statement on two grounds. His first contention is that the Bluefield City Police placed him "in custody" when they picked him up from his job site and therefore he was entitled to the protections of *W. Va. Code*, 49–5–8(d).[3] He maintains that the police should have immediately taken him before an appropriate judicial officer instead of first interrogating him at the station and then taking him to a magistrate 3½ to 4 hours after he was initially picked up. In response, the State admits that the officers did not have probable cause to arrest Mark E.P. prior to his confession and therefore submit that the officers were not required to take him before a judicial officer prior to questioning him.

■■■ Based on the record of both transfer hearings we agree with the State's position which was adopted by the trial court and now affirm our earlier ruling that the police lacked probable cause for his arrest[4] and address Mark E.P.'s second argument that his confession was the product of his illegal detention and therefore is inadmissible.

A confession obtained by exploitation of an illegal arrest is inadmissible. The giving of *Miranda* warnings is not enough, by itself, to break the causal connection between an illegal arrest and the confession. In considering whether the confession is a result of the exploitation of an illegal arrest, the court should consider

**3.** See n. 2.

**4.** *In the Matter of Mark E.P., supra,* 175 W.Va. at

91, 331 S.E.2d at 822.

the temporal proximity of the arrest and confession; the presence or absence of intervening circumstances in addition to the *Miranda* warnings; and the purpose or flagrancy of the official misconduct. Syl. pt. 2, *State v. Stanley,* 168 W.Va. 294, 284 S.E.2d 367 (1981).

▉ In *Stanley,* we applied the ruling in *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), which held that "[d]etention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." Syl. pt. 1(c), in part, *supra.* The test for determining whether a confession is inadmissible, the three factors which are found in syl. pt. 2 of *Stanley, supra,* were first set forth in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) and focus on the causal connection between the illegal conduct and the statement. The exclusion of such confessions is intended to both deter police misconduct and protect the integrity of the judicial process.

In *State v. Ellsworth (J.R.),* 175 W.Va. 64, 331 S.E.2d 503 (1985), we reviewed the admissibility, under *W.Va.Code,* 49–5–8, of a confession given by a 17–year–old and discussed how the standard in *Stanley* would be applied. There we ruled that the police did have probable cause to detain the juvenile and that both his oral and subsequent written statements were admissible. The confession was made on the way to the police barracks and then shortly thereafter was reduced to writing and signed by the juvenile. We stated that where no probable cause exists,

> [t]he validity of such a confession, ... will turn on the custodial circumstances as we have outlined in *State v. Stanley....*
>
> ....

[W]here a suspect is not free to leave the officer's place of questioning, then an illegal detention has occurred and a confession obtained under such circumstances, even though preceded by *Miranda* warnings, would be invalid unless there was a break in the causal connection between the illegal detention and the confession.

*Ellsworth, supra,* 175 W.Va. at 71, 331 S.E.2d at 509–10. Having found no probable cause to arrest or detain Mark E.P., we now analyze the "custodial circumstances" as outlined in *Stanley* and *Ellsworth.*

▉ At the second transfer hearing, Officer Helton testified that he informed Mark E.P. that he was not under arrest and told the employer that he would be returned to the job site. At the station Helton told Mark E.P. that he was a "prime suspect." He was escorted into Helton's office with the two outer doors to the outside closed behind him. One or both of the officers remained with him in Helton's office throughout the interview. He was never informed that he was free to leave or terminate his discussion with the officers. He declined the offer to call his mother and the detectives likewise did not contact her. Therefore, Mark E.P. had no contact with anyone other than Helton and Poe from the time he was placed in the police car at 9:30 a.m. until he completed his statement sometime between 10:30 and 11:00 a.m. Both officers had attended a meeting at the prosecuting attorney's office where the decision was made to get a statement from either of the petitioners.

It is apparent from the testimony of the officers that the sole purpose for taking Mark E.P. to the station was to obtain an incriminating statement from him. The facts in *Dunaway* also involved a suspect who was picked up by the police without being formally arrested, driven to police headquarters and questioned by police officers after being given *Miranda* warnings. Within an hour after reaching the police station the suspect confessed to facts which led to attempted robbery and felony murder charges being filed against him.

Both *Brown* and *Dunaway* condemned custodial interrogations whether secured through formal arrest or a police request for questioning:

> The impropriety of the arrest was obvious; awareness of the fact was virtually conceded by the two detectives when

they repeatedly acknowledged, in their testimony, that the purpose of their action was 'for investigation' or for 'questioning'.... The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up.

*Dunaway v. New York,* 442 U.S. 200, 216, 99 S.Ct. 2248, 2258, 60 L.Ed.2d 824 (1978) (quoting *Brown v. Illinois,* 422 U.S. 590, 605, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975)).

In syl. pt. 1 in *Stanley, supra,* we held: "Where police, lacking probable cause to arrest, ask suspects to accompany them to police headquarters and then interrogate them intermittently for seven hours during which time they are not free to leave or their liberty is restrained, the police have violated the Fourth Amendment."

"Limited police investigatory interrogations are allowable when the suspect is expressly informed that he is not under arrest, is not obligated to answer questions and is free to go." Syl. pt. 2, *State v. Mays,* 172 W.Va. 486, 307 S.E.2d 655 (1983).

While Mark E.P. was in the custody of the Bluefield police for a shorter period of time prior to his confession, there is no indication in the record that he believed or was told that he was free to leave the station. He had no contact with anyone other than the police, at least one of whom was always present with him. As held in *Stanley,* "we find no intervening circumstances between the illegal seizure of the appellant and [his] subsequent statement that would free that statement from the taint of illegal police conduct." *Id.,* 168 W.Va. at 298, 284 S.E.2d at 370.

The written and oral statements of Mark E.P. should have been suppressed and are not admissible against him in any transfer hearing concerning whether there is probable cause to believe he killed Lutricia Dickens.

We therefore remand his case under the same principle enunciated after his first appeal: "Where there are substantial defects in the transfer hearing that go to the validity of the probable cause finding, we will reverse and remand the case for a further transfer hearing. Double jeopardy principles are not involved because a transfer hearing does not involve an adjudication of guilt." Syl. pt. 7, *In the Matter of Mark E.P.,* 175 W.Va. 83, 331 S.E.2d 813 (1985).

## II

The court below at first declined to rule on the admissibility of John A.L.'s confession but then proceeded to list on the record reasons for finding the confession admissible. The judge stated that both confessions were given "freely and voluntarily" and that John A.L., after being placed under arrest, was taken to the Bluefield police station instead of a magistrate for processing and not for the purpose of questioning.

We previously upheld the trial court's ruling that both boys' statements were voluntarily given, *In the Matter of Mark E.P., supra.* With respect to John A.L. we remanded the case to obtain additional evidence regarding the treatment of him by the police immediately following his arrest.

The officers testified that John A.L. was taken to the police station around 2:55 or 3:00 p.m. He was immediately taken into Helton's office, where *Miranda* warnings were read, and he initialled each right and signed the waiver form. He then gave a description of his actions on the day of the crime, which concluded with the fact that he left the victim's home prior to the fire. Helton recorded the statement and John A.L. signed each of the three pages, after which Helton told him no one would believe his story. John A.L. agreed and told Helton to tear up the last two pages. The youth then gave Helton a second statement which depicted how he tied the victim to a bed and poured gasoline around the bed. The interview was stopped at that point by a lawyer who had been summoned to the station by John A.L.'s great-grandmother.

Helton testified that the two statements took "20 to 40 minutes" and then "half an hour" to transcribe. He acknowledged

that John A.L.'s great-grandmother came to the station, but when asked if she were allowed into the interview room testified that "[s]he didn't want to come in." John A.L.'s great-grandmother did not testify at either transfer hearing. After his lawyer appeared, John A.L. was taken through the booking process at the station and then transported to the magistrate's office in Princeton sometime "after 4:00 o'clock."

John A.L. testified for the first time at the second transfer hearing for the limited purpose of explaining how his confession was given. His account differed from the officers' testimony in the following respects. When asked by Helton to give a statement, he testified: "I told them I was going to wait until my grandmother came." He was informed that Mark E.P. had previously given a statement implicating him in the murder and that if he cooperated by giving a statement the police "would help me out and make it easier for me." He asked Officer Poe to leave the room after Poe had stated that he had "no doubt in his mind" that John A.L. killed the victim. When asked whether he had ever denied his statement, John A.L. answered affirmatively that he had previously told his lawyer it was incorrect.

A timeline can be derived from the record which indicates that the officers took Mark E.P. to a magistrate in Princeton sometime after 1:00 p.m. for a detention hearing and to obtain warrants for John A.L.'s arrest and the search of his home. The magistrate ordered Mark E.P. be detained, and the officers transported him back to the Bluefield police station for booking and then to the detention center. Thereafter, they drove to John A.L.'s residence in Bluefield, placed him under arrest, conducted a search of his home and spoke briefly with his great-grandmother before taking him to Helton's office in the Bluefield police station. The waiver of rights form signed by John A.L. lists a time of "2:55 p.m." Detective Helton recorded and revised his statement for approximately an hour prior to the arrival of his lawyer. After his booking, he was taken to a

Princeton magistrate sometime "after 4:00 o'clock."

The time from his arrest to presentation before a magistrate was approximately two to two and one-half hours. John A.L. contends that his confession is inadmissible because he was not *immediately* taken before a magistrate following his arrest as required by *W. Va. Code*, 49–5–8(d).[5] The State contends that we need not reach the issue of the admissibility of John A.L.'s confession because Mark E.P.'s confession provides probable cause for the transfer of both petitioners, but nevertheless argues there was no delay in taking John A.L. before a magistrate after he was processed at the Bluefield police station.

The crucial question is whether the officers, after placing John A.L. under arrest, were justified in taking him to the police station instead of directly to a magistrate. The trial court ruled that John A.L. was taken there solely for "processing." We noted in *State v. Persinger*, 169 W.Va. 121, 286 S.E.2d 261, 270 (1982), "that the State can justify delay by showing the necessity of performing customary booking and administrative procedures...."

With respect to a juvenile we stated in *Ellsworth, supra*, 175 W.Va. at 70, 331 S.E.2d at 508, "that in certain situations a confession otherwise proper is not necessarily invalid because it was obtained before the juvenile was brought before a referee, judge or magistrate."

"Courts have recognized that whether there has been an unreasonable delay in taking an arrested person before a magistrate is not subject to any precise time period." *Persinger, supra*, 169 W.Va. at 135, 286 S.E.2d at 270.

 While the total time period from John A.L.'s arrest to presentment was approximately 2½ hours, we are primarily concerned about the time which elapsed from his arrest to the giving of his oral confession. "The delay occasioned by reducing an oral confession to writing ordinarily does not count on the unreasonableness of the delay where a prompt presentment issue is involved." Syl. pt. 3, *State v.*

---

**5.** *See* note 2.

*Humphrey,* 177 W.Va. 264, 351 S.E.2d 613 (1986).

We also held in syl. pt. 4 of *Humphrey, supra,* that "[o]rdinarily the delay in taking an accused who is under arrest to a magistrate after a confession has been obtained from him does not vitiate the confession under our prompt presentment rule." Neither of these post-confession factors bear on the question of whether an earlier delay induced the confession.

In *Ellsworth, supra,* the oral confession was given shortly after the juvenile was placed in the police car and after *Miranda* warnings were given. There, we found both the oral and the written statement which was started approximately an hour after the juvenile was apprehended to be admissible. John A.L. began reciting his first confession less than an hour after he was arrested, and after being given his *Miranda* rights.

We do not find that the trial judge abused his discretion under the particular facts of this case in holding John A.L.'s confessions to be admissible evidence. The order transferring John A.L. to adult jurisdiction is therefore affirmed. *E.g., State v. Dyer,* 177 W.Va. 567, 355 S.E.2d 356 (1987); *State v. Humphrey,* 177 W.Va. 264, 351 S.E.2d 613 (1986); *State v. Hutcheson,* 177 W.Va. 391, 352 S.E.2d 143 (1986); *State v. Fauber,* 175 W.Va. 324, 332 S.E.2d 625 (1985); *State v. Wilson,* 170 W.Va. 443, 294 S.E.2d 296 (1982).

For the reasons stated above, we reverse the order transferring Mark E.P. to adult jurisdiction and remand his case for further proceedings consistent with this opinion.

Mark E.P.'s case, reversed and remanded; John A.L.'s case, affirmed.