# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 7, 2001

## STATE OF TENNESSEE v. LARICO S. FICKLIN

**Direct Appeal from the Criminal Court for Shelby County**
**No. 97-02834      W. Fred Axley and James C. Beasley, Jr., Judges[1]**

---

**No. W2000-01534-CCA-R3-CD  - Filed August 27, 2001**

---

A Shelby County jury convicted the defendant of second degree murder, and the trial court sentenced him to 25 years as a Violent Offender. In this appeal, the defendant alleges (1) the evidence was insufficient to sustain his conviction, and (2) the trial court erroneously admitted the defendant's custodial confession. We conclude that the defendant's initial arrest was without probable cause, and that the defendant's confession was obtained approximately 53 hours from his arrest without a judicial determination of probable cause. The defendant's confession was, therefore, erroneously admitted, and the error was not harmless. We reverse the defendant's conviction and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Remanded for New Trial**

JOE G. RILEY, J., delivered the opinion of the court, in which DAVID G. HAYES and ALAN E. GLENN, JJ., joined.

A.C. Wharton, Jr., Public Defender; Garland Erguden, Assistant Public Defender (on appeal); and Larry H. Nance, Assistant Public Defender (at trial), for the appellant, Larico S. Ficklin.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Edgar A. Peterson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The state's proof indicated that the 21 year-old defendant met the victim, Belinda Pitts, then thirteen years old, in July of 1995, and immediately began a sexual relationship with her. The two continued their relationship, and the victim became pregnant. On May 13, 1996, the victim's mother and grandmother noticed the victim was missing. The victim's body was discovered on May 15th,

---

[1]The motion to suppress was heard by Judge Axley, whereas Judge Beasley presided over the trial.

and the defendant was seized for questioning later that day. After approximately 53 hours of detention, the defendant confessed to the crime. The jury convicted the defendant of second degree murder.

**TRIAL TESTIMONY**

The victim's mother, Carol Ann Pitts, the victim's grandmother, Laura Reed, and the victim resided together. Pitts testified she first met the defendant in August of 1995, when he came to her home asking to see the victim. In response, Pitts sent the defendant away, informing him that the victim was too young to "receiv[e] company." Despite Pitts' instructions, the defendant continued seeing the victim.

Pitts stated that on Sunday, May 12, 1996, she, Reed, and the victim went to Tunica, Mississippi, where Pitts and Reed gambled at a casino. They returned home at approximately 10:00 p.m. Pitts further stated that Reed awakened the victim for school Monday morning. Pitts and Reed traveled to Tunica Monday morning after the victim went to school. When they returned home at approximately midnight, they discovered that the victim was missing. Pitts reported this to the police.

Pitts went to work on the evening of Tuesday, May 14th, and returned home early Wednesday morning. After Pitts returned home, the defendant came to her residence and stated that he had been unable to locate the victim and inquired if she had heard from the victim. The defendant again came to her residence later that morning and informed her that someone saw the victim going toward "the wooded area of the [Bellevue] Park." Pitts requested that the defendant accompany Reed and her there, and he agreed. The defendant never stated the identity of the person who informed him of the sighting of the victim near the park.

Pitts drove Reed and the defendant to the park, approximately five blocks from the residence. They exited Pitts' vehicle, and the defendant led them into a wooded area, down a path, through an opening cut in a fence, and to a shed. Pitts went in the shed, looked into a broken window on a padlocked door, and saw the victim. She then called the victim's name and, upon receiving no reply, exited the building and informed Reed and the defendant of her discovery. She testified the defendant stated, "Belinda, no, Belinda" and "just started jumping up and down."

Pitts and Reed then made their way back to the vehicle, returned to their residence, phoned the police, and then drove back to the park. Sometime later, the police responded to the scene, and Pitts informed them of the victim's location. The defendant had left the scene.

Reed, the victim's grandmother, corroborated Pitts' testimony. Additionally, she testified the defendant came to her residence on Tuesday, May 14th, three times and asked if she had seen the victim. One of those times the defendant stated, "I just want – I'm going to see can [sic] I find her. I hope she's not hurt. I hope she's not dead." On cross-examination, Reed stated that the defendant never appeared upset or nervous.

Lieutenant Edward Cash of the Memphis Police Department testified the defendant was subsequently brought to the station in handcuffs for questioning. Cash testified the defendant denied any involvement in the victim's death throughout questioning that day. Cash stated that, later in the day, the defendant was booked for "further investigation." Cash attested he interviewed others on Thursday, May 16th, and did not talk with the defendant again until Friday.

On Friday, May 17th, Cash testified the defendant was brought to the interview room sometime in the morning, but the interview did not begin until later that afternoon. Cash further attested that although the defendant was interviewed for "several hours," several breaks were taken which allowed the defendant to eat and take care of his personal needs. After continued questioning, the defendant orally confessed his involvement in the homicide.

Afterwards, Cash and Lieutenant James Nichols took the defendant to the transcriptionist's office. The defendant gave a detailed confession which was transcribed and introduced at trial. The defendant's statement began at 6:36 p.m. and was signed by the defendant at 8:58 p.m. on Friday, May 17th. In the statement, the defendant said he had sex with the victim, beat her with his fists and a brick when she denied being unfaithful to him, and stabbed her in the throat with a knife.

Captain Frederick Sansom testified that no latent fingerprints were recovered from the crime scene. The stipulated testimony of TBI forensic serologist Steve Wiechman was that he performed one test on swab samples taken from the victim's rectum and vagina, and no semen nor DNA was recovered.

Chad Johnson, a TBI forensic scientist, testified that he tested a knife which the defendant allegedly used as the murder weapon, the defendant's clothing, and the defendant's shoes for the presence of blood. All items tested negative. Additionally, Johnson tested the victim's panties and dress for sperm and semen, and both items tested negative.

Dr. O'Brian Cleary Smith, Medical Examiner for Shelby County, opined the victim's death occurred between 3:00 a.m. and 3:00 p.m., on Monday, May 13, 1996. Additionally, Dr. Smith found acid phosphatase, a chemical indicator of semen, in the victim's vagina and rectum.

The defense proof consisted of testimony from Wallace Logan, Barry Flynn, Anderson Davis, and the defendant.

Wallace Logan, the defendant's work supervisor, testified he saw the defendant on Monday, May 13th, between 5:00 a.m and 6:00 a.m., when he instructed the defendant to return to his work area. Logan further stated he sent the defendant "to the time clock" at approximately 9:00 or 9:15 a.m.

Barry Flynn testified he was the defendant's friend and co-worker. Flynn stated he and the defendant left for work at approximately 4:40 a.m. on Monday, May 13th. He further stated that at

approximately 6:00 a.m., Logan brought the defendant to him and instructed him to take the defendant to another work area.

Anderson Davis, the defendant's other work supervisor, testified he saw the defendant arrive at work on Monday, May 13th, between 5:30 a.m. and 6:00 a.m. He further testified he saw the defendant leave work at approximately 9:15 a.m. Davis stated the defendant called on Tuesday and said that he would not be at work that day due to a doctor's appointment. Davis next saw the defendant at work on Wednesday morning, May 15th, when the defendant informed him that his fifteen or sixteen-year-old sister was missing. Davis, believing the defendant was under extreme pressure because his sister was missing, transported him from the work site.

The defendant testified he met the victim in July of 1995, and the two immediately began a sexual relationship. Furthermore, the defendant testified the victim called him almost every night and would leave her residence at night to meet him in an alley to engage in sexual relations.

On Monday, May 13th, the defendant testified he left for work at 4:00 a.m. with Barry Flynn. Although he was scheduled to work from 5:00 a.m. until 12:30 p.m., the defendant stated he was sent home between 9:15 and 9:30 a.m. because he left his assigned work area. He denied seeing the victim that day.

On Tuesday, May 14th, the defendant informed his employer that he was unable to attend work due to a doctor's appointment. The defendant, however, stated he was untruthful concerning the existence of a medical appointment and concocted the story so he could meet the victim. He testified he went to Stafford Street to meet her, but she did not arrive. Later, his grandmother informed him that Pitts said the victim was missing and requested he come by her residence. The defendant stated he went to Pitts' residence between 3:00 p.m. and 4:00 p.m., talked to Pitts concerning the victim's whereabouts, and left the residence in search of the victim.

The defendant further testified that on Wednesday, May 15th, he was scheduled to work from 5:30 a.m. until 12:30 p.m. He, however, felt nervous because the victim was missing and asked his supervisor, Anderson Davis, to take him home. The defendant told Davis that his sister was missing "because I did not want him to know I was talking to a fourteen-year-old. So I told him it was my sister so it could be reasonable for me to get off work." Anderson drove the defendant to the Pitts residence at approximately 7:40 a.m.

The defendant testified that upon arrival at the Pitts residence, he told Pitts certain information he learned concerning the victim, and Pitts requested he accompany her and Reed to Bellevue Park. The defendant agreed, and they drove to the park. He stated Pitts led them through a "cut gate;" Pitts walked up to the building; Pitts went inside of the building; and Pitts said she saw the victim.

The defendant stated he left the scene and later received a phone call from his grandmother informing him that the police were looking for him. He instructed his grandmother to tell the police

his location. The defendant stated that when the police arrived, they handcuffed him, placed him in the cruiser, and took him to the police station where he was led to an investigation room. He claimed the handcuffs were clamped tightly on him; officers cursed, fussed and spit at him; officers informed him that he could prove his innocence by providing samples for DNA testing; officers returned within two hours and told him that the DNA proved he was guilty; and he was led to the lower level of the jail, was not provided a bed, shower, toothbrush, or allowed to use the telephone.

The defendant stated that on Thursday, May 16th, he was taken to the investigation room at noon; officers yelled and cursed at him; he was shown pictures of the victim's body and was told details concerning her death; and he was sent back to his jail cell.

The defendant testified that on Friday, May 17th, he was again taken to the investigation room in the morning; officers placed a Bible on the table; officers promised to help him if he confessed; officers asked him if he wished to pray and led him in the Lord's Prayer; officers told him how the victim was killed; and he gave a false confession to the transcriptionist while being coached by the officers. He testified he gave the false confession because he "would rather go to a hospital innocent than go to a prison innocent."

Anne Langford, a transcriptionist with the Memphis Police Department, rebutted the defendant's testimony. She stated the defendant's transcribed confession was not coached, and the defendant never denied committing the crime.

## SUFFICIENCY OF THE EVIDENCE

### A. Standard of Review

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318, 99 S.Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979). We do not reweigh or reevaluate the evidence and are required to afford the state the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). It is the defendant's burden to show this court why the evidence is insufficient to support the verdict returned by the trier of fact in his or her case. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

### B. Analysis

The testimony of the medical examiner revealed the victim's death occurred on Monday, May 13th, between 3:00 a.m. and 3:00 p.m. The defendant was seen at work at approximately 5:30 a.m. that morning, and he left work at approximately 9:15 a.m. Reed testified that on Tuesday, May 14th, the defendant came by her residence and stated, "I hope she's not hurt. I hope she's not dead." Pitts

and Reed both testified the defendant led them directly to the building at Bellevue Park where the victim was found. However, the most damning evidence was the defendant's confession.

The confession and corroborating circumstantial evidence are sufficient to sustain the conviction for second degree murder. This issue is without merit.

## II. SUPPRESSION OF EVIDENCE

The defendant contends his confession was the result of his illegal seizure and illegal detention and should have been suppressed. We are constrained to agree.

### A. Testimony at Suppression Hearing

At the suppression hearing, Officer John Troup testified that on Wednesday, May 15, 1996, he and another officer were ordered to bring the defendant to the police department for questioning. Officer Troup stated he and another officer arrived at the residence at approximately 1:30 p.m., and the defendant was standing on the sidewalk waiting for them. Officer Troup informed the defendant that "we'll have to transport [you] downtown," patted him down, and handcuffed him. Officer Troup then took the defendant to the police department.

James Fitzpatrick, an investigator with the Memphis Police Department, testified that at approximately 2:10 p.m., he observed the defendant handcuffed to a chair in the interview room. Fitzpatrick escorted the defendant to the restroom with his hands cuffed in front, and he re-cuffed the defendant to the chair after returning to the interview room.

Sergeant A. J. Christian testified the defendant was informed of his Miranda rights and executed a signed written waiver at 3:10 p.m., and the defendant executed a signed written waiver of his telephone privilege at 3:12 p.m. Sgt. Christian stated the defendant denied involvement in the murder. Sgt. Christian further testified he considered the defendant a "suspect" when the interrogation began.

Lieutenant James Nichols was a homicide detective with the Memphis Police Department. Nichols testified that on Wednesday, May 15th, the defendant executed a written consent to search his residence and a written consent for the taking of bodily fluids. The defendant denied any involvement in the homicide. Nichols then advised the defendant that he would be "detain[ed] . . . while [they] checked out some of the things he told [them]." The defendant was then taken to jail that night. According to Nichols, the defendant was at that time "a prime suspect, [but] I had yet not developed enough probable cause to charge him." Nichols further explained that the defendant had been "brought in" for questioning because he left the scene after the discovery of the body. Nichols stated he only had "mere suspicions" when the defendant was jailed the first night, and the defendant was jailed so Nichols could "check out his alibis to develop probable cause to charge him."

On Thursday, May 16th, and Friday, May 17th, Lieutenant Nichols stated that he was "mostly . . . out in the field and . . .[he] tried to verify such things." On Friday, May 17th, at approximately 2:15 p.m. the defendant again executed a written waiver of his Miranda rights, a written waiver of his telephone privileges, and a written consent to search his other residence. He was again questioned and denied involvement in the homicide. After being shown a picture of the deceased victim, the defendant became emotional and eventually stated his involvement in the homicide. At 6:36 p.m. the defendant began giving his formal statement to a transcriptionist. The written statement was signed by the defendant at 8:54 p.m.

## B. Issue of Waiver

The defendant's motion to suppress alleged violations of the "Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and Article 1, §§ Seven, Eight and Nine of the Constitution of Tennessee." More specifically, the motion alleged the statements were "involuntary and not the product of a free and deliberate choice." We have further examined the memorandum in support of the motion as well as the argument made at the motion to suppress. The only issue discussed related to whether the defendant's statements were voluntary. There was no argument or contention that the statements were the result of an illegal seizure or illegal detention. Likewise, the trial court issued extensive findings relating almost exclusively to the voluntariness issue. However, the trial court did address the detention issue in one paragraph of the findings and concluded (1) there was no Fourth Amendment violation; (2) "defendant was willfully brought to the station for questioning;" (3) "after questioning, the officers had probable cause to arrest defendant;" (4) "defendant soon after confessed;" and (5) the "seizure was not unreasonable." The motion to suppress was, therefore, denied.

The defendant in this appeal does not challenge the voluntariness of the statements, but rather alleges the statements were "fruit of the poisonous tree" arising from his illegal detention. Ordinarily, an appellant cannot change theories from the trial court to the appellate court. State v. Dooley, 29 S.W.3d 542, 549 (Tenn. Crim. App. 2000). However, in this case the state does not allege the issue is waived and has addressed the issue on its merits. In view of this fact, the trial court's conclusion that the defendant was not illegally detained, and an adequate record to review this issue, we also will address the issue on the merits.

## C. Standard of Review

The trial court found the seizure of the defendant was not unlawful, and the officers had probable cause to arrest the defendant "after questioning." The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. State v. England, 19 S.W.3d 762, 766 (Tenn. 2000). However, this court is not bound by the trial court's conclusions of law. State v. Simpson, 968 S.W.2d 776, 779 (Tenn. 1998). The application of the law to the facts found by the trial court are questions of law that this court reviews *de novo*. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000).

The facts material to the suppression issue are mostly undisputed. Thus, the crucial inquiry is the conclusion of law reached by the trial court. The trial court's conclusion that the defendant's seizure and detention were not improper is a conclusion of law that we address *de novo*. Daniel, 12 S.W.3d at 423.

## D. Initial Seizure

The trial court found the seizure of the defendant was not in violation of the Fourth Amendment. We respectfully disagree with this conclusion of law.

### (1) Seizure v. Arrest

The officers apparently, and mistakenly, believed it was permissible to take a person into custody without probable cause for questioning since there is no "arrest." However, for Fourth Amendment purposes we must determine whether the defendant was "seized." State v. Johnson, 980 S.W.2d 414, 422 (Tenn. Crim. App. 1998). Whenever an officer restrains the freedom of an individual to walk away, the officer has "seized" that person for Fourth Amendment purposes. State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997). It is clear that handcuffing the defendant and transporting him to the police department constituted a custodial seizure. Furthermore, the defendant continued to be detained the entire time as he was not free to leave.

### (2) Investigatory Detention

In addition, this was not an investigatory stop or detention which, although may be justified upon reasonable suspicion supported by specific and articuable facts, must be temporary and for a limited purpose. Florida v. Royer, 460 U.S. 491, 498, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). "[D]etention for custodial interrogation–regardless of its label–intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." Dunaway v. New York, 442 U.S. 200, 216, 99 S. Ct. 2248, 2258, 60 L. Ed. 2d 824 (1979); Johnson, 980 S.W.2d at 422. In summary, "reasonable suspicion of crime is insufficient to justify custodial interrogation even though the interrogation is investigative." Royer, 460 U.S. at 499. The defendant in this case was admittedly detained for custodial interrogation; therefore, the officers had to have probable cause in order to seize and detain him. *See* State v. Melson, 638 S.W.2d 342, 350 (Tenn. 1982).

### (3) Probable Cause

An officer in Tennessee may effect a warrantless arrest "[w]hen a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested to have committed it." Tenn. Code Ann. § 40-7-103(a)(3). It is uncontested that a homicide occurred, and homicide, regardless of its degree, is a felony offense. *See* Tenn. Code Ann. §§ 39-13-201 *et. seq.* Accordingly, the dispositive issue is whether the officer at the time of defendant's initial seizure had reasonable cause for believing the defendant was the person who committed the felony.

Whether probable cause exists depends upon whether the facts and circumstances and reliable information known to the police officer at the time of the arrest "were sufficient to warrant a prudent [person] in believing that the [individual] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91, 85 S. Ct. 223, 225, 13 L. Ed. 2d 142 (1964); State v. Marshall, 870 S.W.2d 532, 538 (Tenn. Crim. App. 1993). Probable cause must be more than mere suspicion. Melson, 638 S.W.2d at 350. Generally, the subjective motivations and characterizations by the police officers are not determinative as to the legitimacy of an arrest, search or seizure. Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996); State v. Vineyard, 958 S.W.2d 730, 736 (Tenn. 1997).

### (4) Analysis

Nichols testified at the motion to suppress that the defendant was originally seized because Nichols found it "suspicious" the defendant did not remain at the scene until the police arrived. "So . . . [that was] the only suspicion we had at that point that he might be involved, and yet that could be explained away by emotion." We agree with Nichols that probable cause to arrest defendant did not exist merely because he left the crime scene and the officer was "suspicious;" thus, the seizure of the defendant for custodial interrogation was illegal. We further agree with Nichols' testimony that he had "not developed enough probable cause to charge [the defendant]" when he was jailed the night of his seizure.

Because we have determined the defendant was illegally seized without probable cause, our next inquiry becomes whether the defendant's statement was illegally obtained as a result of the illegal seizure. The analysis used to determine admissibility of such a statement is the "fruit of the poisonous tree" analysis, as opposed to a voluntariness test. Brown v. Illinois, 422 U.S. 590, 601, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975); State v. Huddleston, 924 S.W.2d 666, 674 (Tenn. 1996). In order to ascertain whether a statement obtained in violation of the Fourth Amendment should be suppressed, the primary inquiry is "whether [the statement] 'was sufficiently an act of free will to purge the primary taint of the unlawful invasion.' " Brown v. Illinois, 422 U.S. at 599 (quoting Wong Sun v. United States, 371 U.S. 471, 486, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)); *see also* Huddleston, 924 S.W.2d at 674.

Although this determination is made on a case by case basis, the following four considerations are important in making this determination:

> (1)  the presence or absence of Miranda warnings;
> (2)  the temporal proximity of the arrest and the confession;
> (3)  the presence of intervening circumstances; and finally, of
>       particular significance,
> (4)  the purpose and flagrancy of the official misconduct.

Huddleston, 924 S.W.2d at 674-75. The burden of proving admissibility by a preponderance of the evidence rests upon the state. *Id.* at 675.

**E. <u>McLaughlin</u> Violation**

Although we conclude that the defendant was illegally seized, we will also address the defendant's contention that the defendant's statements must be suppressed due to the lack of a judicial determination of probable cause.

The Fourth Amendment requires that a judicial determination of probable cause be issued promptly following a warrantless arrest. <u>Gerstein v. Pugh</u>, 420 U.S. 103, 125, 95 S. Ct. 854, 43 L. Ed. 2d 54 (Tenn. 1975). A judicial determination of probable cause within 48 hours of arrest will ordinarily comply with the <u>Gerstein</u> promptness requirement. <u>County of Riverside v. McLaughlin</u>, 500 U.S. 44, 56, 111 S. Ct. 1661, 114 L. Ed. 2d 49 (1991). If no determination is made within 48 hours, the burden shifts to the government to show a bona fide emergency or other extraordinary circumstance. *Id*. at 57; *see also* <u>Huddleston</u> 924 S.W.2d at 672. After the court has determined a <u>McLaughlin</u> violation has occurred, it must look at the same four previously discussed factors to determine whether the confession should be suppressed. <u>Huddleston</u>, 924 S.W.2d at 674-75. It is clear in the case at bar that there was a <u>McLaughlin</u> violation.[2] Thus, we will analyze these four factors in light of both the illegal seizure and the 53-hour detention without a judicial determination of probable cause.

### (1) <u>Miranda</u> Warnings

The defendant executed three separate written <u>Miranda</u> rights waivers prior to his transcribed confession. This factor favors admission of the defendant's confession; however, <u>Miranda</u> warnings alone do not *per se* authorize admission of the confession. <u>Brown</u>, 422 U.S. at 603.

### (2) Temporal Proximity

Ordinarily, the longer the time between the illegal seizure and the confession the more likely the taint of the illegal arrest will have been purged. 5 Lafave, **Search and Seizure** § 11.4(b), p. 258 (3d ed. 1996). However, when the detention becomes unlawful under <u>McLaughlin</u>, the passage of time actually makes the violation worse. <u>Huddleston</u>, 924 S.W.2d at 675. Once the detention becomes unlawful, the pressure to confess "increases with each moment of continuing illegal detention." *Id.* Here, the defendant was illegally seized and illegally detained prior to his confession well over 48 hours after his illegal seizure. This factor weighs heavily in favor of suppression.

### (3) Intervening Circumstances

Next, we consider whether there were any intervening circumstances that would purge the taint of the illegal arrest and detention. An example would be a defendant's consultation with an attorney, relative, or friend prior to the time the statements were given. *Id.* Although an officer

---

[2]The state in its brief, at least implicitly, recognizes the <u>McLaughlin</u> violation since its brief is devoted to a discussion of the four factors authorizing admission even though there is a violation.

originally testified, and the trial court found, that the defendant called his mother on the night of May 15th, the officer finally stated that the call to which he referred was actually made on May 17th at 8:58 p.m. immediately _following_ the written confession. Thus, there is no indication that the defendant had any intervening conversations with family prior to his confession. Although the state argues that the defendant's waiver of opportunities to make phone calls is an intervening circumstance, we do not find this to be an intervening circumstance that would favor admission. This factor weighs heavily in favor of suppression.

### (4) Flagrancy of Official Misconduct

Lieutenant Nichols best summarized the defendant's detention from the time of his seizure at 1:30 p.m. on May 15th, until the time of his confession on the late afternoon of May 17th, as follows: "I began to suspect him, but all I had was [sic] mere suspicions, and so I held him while we begin [sic] to check out his alibis to develop probable cause to charge him."

The United States Supreme Court has characterized as unreasonable and improper any delay "for the purpose of gathering additional evidence to justify the arrest." McLaughlin, 500 U.S. at 56. Here, that is precisely, and admittedly, what occurred. The defendant was illegally seized without probable cause and illegally detained in order for the authorities to endeavor to establish probable cause for an arrest. Although it appears the authorities subjectively believed there was no impropriety in the seizure and continued detention, this hardly mitigates the flagrancy of these violations. The initial illegal seizure was compounded by the continued illegal detention for well over 48 hours. _See_ Huddleston, 924 S.W.2d at 676. The flagrancy of the official misconduct weighs heavily in favor of suppression.

After a careful consideration of the relevant factors, we must conclude that the admission of the defendant's confession was error since it was a product of his illegal arrest and prolonged illegal detention without a judicial determination of probable cause. We further conclude the admission of the confession was not harmless error. Without the confession, the evidence of guilt was circumstantial and certainly not overwhelming. Thus, the matter must be remanded for a new trial.[3]

### CONCLUSION

Based upon the foregoing, we conclude the defendant was illegally seized without probable cause and illegally detained beyond 48 hours without a judicial determination of probable cause. Accordingly, the confession should have been suppressed. The judgment of the trial court is reversed, and the case is remanded for a new trial.

---

[3] In view of our conclusion that the defendant is entitled to relief based upon the Brown and McLaughlin violations, we choose not to address the alleged Tenn. R. Crim. P. 5(a) violation. _See_ Huddleston, 924 S.W.2d at 670-71 (applying voluntariness test in determining whether 5(a) violation should result in suppression).

_____

JOE G. RILEY, JUDGE